**GENERAL CRUDE OIL COMPANY,**
Appellant,

v.

Edwin AIKEN, Appellee.

No. 3511.

Court of Civil Appeals of Texas.

Eastland.

April 8, 1960.

Rehearings Denied May 6, 1960.

Turner & Seaberry, Eastland, for appellant.

Mays, Leonard & Moore, Sweetwater, for appellee.

COLLINGS, Justice.

Edwin Aiken brought this suit against General Crude Oil Company. He alleged that his 3,707 acre ranch had been permanently damaged and suffered a decrease in value in the amount of $20 per acre because of an alleged salt water pollution caused by the defendant's negligence. Defendant oil company answered and alleged that it was the owner of an oil and gas lease on plaintiff's land, that it had drilled

ten wells thereon, most of which were dry holes and not productive, but that three of the wells were commercially productive and that plaintiff was receiving royalty payments thereunder; that the producing oil wells were also producing some salt water but that defendant disposed of same in salt water pits located in the southwest corner of the ranch on section 249 where the three producing oil wells and the fresh water spring, which plaintiff claims to have been permanently damaged, are located; that the damage to section 249 was not permanent but temporary and the remaining 3,067 acres suffered no damage whatever.

The case was tried before a jury which found that the defendant was guilty of negligence in disposing of the salt water, that the damage to plaintiff's land as a whole by reason of the salt water pollution was permanent, that the reasonable market value of the land as a whole before the pollution was $240,955, and that the value of such land after the pollution was $203,885. Based upon the verdict, judgment was rendered for plaintiff for $37,070. General Crude Oil Company has appealed.

■ It is contended in appellant's first two points that the court erred in overruling its motions for an instructed verdict and for judgment non obstante veredicto. It is urged that the pleadings and evidence do not show a breach of any legal duty by appellant. The evidence shows that appellant is the owner of an oil and gas lease covering appellee Aiken's 3,707 acre ranch; that appellant had drilled and was operating three producing oil wells on section 249 in the southwest corner of the land and that salt water was being produced along with the oil from such wells; that in the operation of the lease it was necessary to separate the salt water from the oil and dispose of the salt water. Appellant contends that as the owner of the oil and gas lease it had the dominant estate in the land and the right to make such use of the premises as was reasonably necessary to operate and to effectuate the purpose of the lease. Although we agree with the statement of the general rule, we cannot agree with appellant's contention that the only duty owed to appellee was not to willfully, intentionally or wantonly injure his land. Under an oil and gas lease the surface estate "is servient to the mineral estate for the purposes of the mineral grant, but even that right is to be reasonably exercised with due regard to the rights of the surface owners." Gulf Production Co. v. Continental Oil Co., 139 Tex. 183, 132 S.W. 2d 553, 563, 164 S.W.2d 488; Gregg v. Caldwell-Guadalupe Pick-Up Stations, Tex.Com.App., 286 S.W. 1083, 1084; Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410. In exercising the right to make such use of the premises as was reasonably necessary to operate the oil and gas lease, appellant owed the duty to appellee as owner of the surface estate not to negligently injure such estate. Weaver v. Reed, Tex.Civ.App., 303 S.W.2d 808, Connellee v. Magnolia Petroleum Co., Tex. Civ.App., 54 S.W.2d 577; Shell Oil Co. v. Dennison, Tex.Civ.App., 132 S.W.2d 609, (Writ Ref.).

■ The jury found that appellant was negligent in the following respects proximately causing the damage to appellee's land: "(1) In constructing its salt water pit at a location uphill from and higher than appellee's fresh water spring; (2) In failing to seal its salt water pit with watertight material to prevent the salt water from penetrating the fresh water strata in the ground below; and (3) In using a salt water pit that was too small to allow for proper evaporation of the salt water placed in it."

There was ample evidence in our opinion to support the above findings of negligence and proximate cause. The evidence shows that the water bearing formation which supplied appellee's fresh water spring sloped from the salt water pit, constructed and used by appellant, north to the spring. It is undisputed that the pit was 27 x 44 ft. in

size and 3½ feet deep, that it was 35 feet higher in elevation than the spring and 730 feet from it; that the bottom of the pit was porous and cut into the water producing formation that supplied appellee's spring. There was evidence to the effect that the problem created by such a location of a salt water pit should have been evident to a geologist and that appellant had three geologists on its staff when the pit was built and used; that the pit was not large enough to take care of the salt water placed in it by means of evaporation. The evidence is undisputed that the salt water pit was never lined with a water-tight material so that salt water would not run or seep into the ground and water producing formation supplying appellee's spring although such material was available. Appellant's area superintendent admitted that he knew of no other earthen salt water disposal pit situated 35 feet above a fresh water spring with its bottom in the sand that was producing water 730 feet away. He also admitted that he knew salt water was going in the ground because the pit would only hold 464 barrels and that appellant had put many times that much water in the pit. There was evidence to the effect that if salt water evaporated in a pit, salt would be left; that, although more than 48,000 barrels of salt water containing more than 1,300 tons of salt went into the pit over a period of about three years, no accumulation of salt was ever left in sufficient quantity to require it to be removed from the pit; that, long before salt water was discovered in the spring, a field superintendent of appellant had expressed fear that the salt water disposal pit would cause damage to the creek where the spring is located. The evidence showed that the pit had a capacity of 464 barrels of water but was never full during the three years it was used, although during several of the months it was used, more than 2,000 barrels of water went into it. Appellant's superintendent further testified that it became apparent to him and other employees of appellant that salt water was going into the ground from the pit but they continued to use it; that as long as the pit wasn't running over appellant was satisfied with the operation whether the salt water was evaporating or going into the ground; that it was not reasonably necessary for appellant to put salt water in appellee's spring to conduct its operation of the oil and gas lease. Appellant's first and second points are overruled.

■ We overrule appellant's points in which it contends there is no evidence in the record to support the findings that appellee's ranch as a whole was damaged, and the findings of the value of appellee's land as a whole immediately before and after the pollution of his fresh water spring, or in the alternative, that such findings are against the great weight and preponderance of the evidence. Concerning the value of the land before and after the pollution of his fresh water spring, appellee Aiken testified that he was the owner of all the surface of his 3,707 acre ranch; that he was the owner of the executive rights to make oil and gas leases thereon, the right to receive all bonus money paid for oil and gas leases thereon, the right to receive all delay rentals paid under the terms of oil and gas leases thereon, and the right to at least one-half of the royalties under the entire ranch. He testified that he had kept up with the value of the land in the vicinity of his ranch ever since he purchased it in 1936; that he knew of land sales in the vicinity; that it takes both minerals and surface to make a ranching unit; that the damage to his spring lost him the only permanent sweet water on his ranch and in times of drouth would greatly handicap his operation; that the spring in the recent dry spell had enabled him to save approximately 500 head of sheep; that the pollution of the spring reduced the value of his entire ranch; that the present and potential salt water damage to his land went to the heart of his ranch; that it worked into both pastures; that an efficient operation of the ranch as a whole depended upon the

proper use of the highly developed area which because of the salt water damage would now be impossible; that he was familiar with the value of his ranch as a whole, both before and after it was damaged by the salt water pollution. Appellant testified that the market value of his ranch before the salt water pollution was $70 to $75 per acre; that the salt water pollution had damaged his ranch and that the value of the ranch as a whole after such pollution was $45 to $50 per acre.

Other witnesses for appellee who testified that they were land owners in the vicinity and said they were familiar with appellee's land and acquainted with its value before and after the salt water pollution, gave their opinion of the value of the land, as a whole, before, and also their opinion either of the value after pollution or of the reduction in value because of the pollution. See McDaniel Bros. v. Wilson, Tex. Civ.App., 70 S.W.2d 618, (Writ Ref.). Contrary to appellant's contention this evidence was admissible and in our opinion is of probative force tending to show that the land was damaged and reduced in value as a whole and to show the reasonable market value of appellee's land as a whole both before and after the salt water pollution. Texas Pacific Coal & Oil Co. v. Taylor, Tex.Civ.App., 47 S.W.2d 1110; Houston Lighting & Power Co. v. Daily, Tex.Civ. App., 291 S.W. 317; Haynes B. Ownby Drilling Co. v. McClure, Tex.Civ.App., 264 S.W.2d 204. There was ample evidence that the value of appellee's entire ranch was reduced because of the wrongful pollution of his underground water. Although there is evidence to the contrary which we have given full consideration, we are of the opinion that the finding that the land as a whole was damaged is not against the great weight and preponderance of the evidence.

We overrule appellant's point to the effect that there is no evidence to support the finding that the damage to appellee's land by reason of the salt water pollution is permanent, and that such finding is against the great weight and preponderance of the evidence. The record is voluminous and it is not practical to attempt a recitation of the evidence in detail. We have, however, carefully considered the record and find evidence to the effect that enough salt water entered into appellant's pit to contaminate a body of fresh water six inches deep over 2,500 acres of land to such an extent that it would damage the land and the grass thereon. A geologist called by appellee testified that the bulk of the salt water placed in appellant's pit should be past the spring in ten years, but that the spring would still have salt in it and the problem would not be solved. He stated his opinion that the water would still be too salty to drink for a much longer period than ten years; that the salt would then be in the water table east of the spring moving at a much slower rate of speed and that in his opinion it would take 26 years for the main portion of the salt water to pass a water tank on appellee's land, described as tank number one, from which tank run off water would wash the salt into another of appellee's tanks and then out on the most highly developed portion of his ranch; that it would probably take hundreds of years for all this salt water to get off appellee's land. The geologist testified to the effect of the salt water on the most productive area of appellee's land, stating how it would affect the structure and consistency of the soil in such a way as to make it compact and incapable of absorbing rainfall, how it would kill vegetation and leave the land barren and subject to erosion. Pictures in evidence showed an accumulation of salt on the surface of the spring and dead trees between the spring and the salt water pit. The witness testified, contrary to appellant's contention and pleadings, that a small dam and a pump below the spring would not stop the salt water pollution and further damage to appellee's land. He testified that the kind of dam across the creek below appellee's spring which might stop the

flow of salt water under the ground would cost around $50,000 or $60,000 and even then there could be no certainty that the damage would not continue. There is evidence in our opinion to support the finding that the damage to appellee's land is permanent, and the finding is not against the great weight and preponderance of the evidence. Appellant's contention, in effect, that no permanent damage is shown because no witness testified that the damage would last for more than a period of years is not well taken. Injury to land may be permanent in law without being perpetual. Fort Worth & N. O. Ry. Co. v. Wallace, 74 Tex. 581, 12 S.W. 227; Williams v. Henderson County Levee Improvement District Number 3, Tex.Com.App., 36 S.W.2d 204; Lone Star Gas Co. v. Hutton, Tex. Com.App., 58 S.W.2d 19; Texas Pacific Coal & Oil Co. v. Taylor, supra; Cosden Oil Co. v. Sides, Tex.Civ.App., 35 S.W.2d 815.

The court gave the following definition:

"You are instructed that the term 'permanent' as used in this charge, carries with it the idea of something that is durable and lasting, and that the market value of the land has been permanently injured. A damage may be permanent without being perpetual, depending upon the surrounding facts and circumstances."

Appellant's objections and exceptions to the above instruction on the grounds that it was ambiguous, confusing and misleading, a comment on the weight of the evidence and erroneous in that it failed to tell the jury "that an injury that lasts for a time only even though it be for several years cannot be termed permanent" are not well taken and are overruled. See cases cited above.

▆▆ Several of appellant's points complain of the action of the court in sustaining objections to evidence tendered by appellant and in refusing to sustain appel-lant's objections to certain evidence introduced by appellee. We have examined the record in connection with these points and find no reversible error in excluding evidence tendered by appellant concerning the amount of money appellant spent in developing its lease on appellee's land, its gross receipts and operating expenses, the cost of drilling a salt water disposal well, and the amount of money received by appellee as royalty payments from production. Nor do we find any reversible error in permitting appellee to testify that he fenced off the spring upon the advice of a veterinarian and in permitting appellee's petroleum engineer to testify that it was not usual and customary to put over 48,000 barrels of salt water in a pit the size of the one here shown in evidence. In view of the disposition of this case, we do not deem it necessary to discuss these points in detail.

▆▆ In points 13 and 14, appellant contends that the court erred in overruling its objections and exceptions to special issues numbers 18 and 19. Special issue number 18 inquired concerning the market value of appellee's land "as a whole immediately before the salt water pollution". Special issue number 19 inquired concerning the value of appellee's land "as a whole after the salt water pollution". One of the objections urged to these issues was that they inquired concerning the value of the land "as a whole" and did not confine the inquiry to the surface only. Generally speaking the measure of damages for permanent injuries to realty is the difference between the market value of the land immediately before and immediately after the injury. 13 Tex.Jur. (Rev.) 566, and cases cited.

Appellant urges that the issues on damages should have excluded the mineral estate. Appellant points out that prior to the damage from salt water pollution appellee had three producing oil wells on his land, paying him monthly royalties of between $1,000 and $2,000; that from 1955

up to the time of trial the production from these oil wells declined to a fraction of the amount produced before the pollution. Appellee's pleadings claim no damage to the minerals in, on and under his land by reason of the salt water pit, and the evidence showed no such damage. It is urged by appellant that because of the undisputed fact of such a decline in the oil production and income from appellee's land there is an inescapable conclusion that the market value of the minerals or the royalty on his land would also decrease, and therefore the market value of Aiken's ranch as a whole (including minerals) would have declined regardless of the salt water pollution during the times inquired about in special issues numbers 18 and 19. Appellant contends that appellee was not entitled to recover from appellant for any decrease in value resulting from a decline in oil production not caused by the operation of appellant's salt water pit.

In our opinion appellant's contention in this respect is well taken. Under the peculiar facts of this case the difference in the market values inquired about in special issues 18 and 19, include, or may include, a difference for which appellant is not liable to respond to appellee in damages. Such issues do not restrict the difference in value in such a way as to include only damages sustained from injuries proximately caused by appellant's negligence. To permit appellee to recover the difference of the value of the land "as a whole" would in this case compensate him not only for damage by reason of salt water pollution, but also for decline in oil production not shown to be the result of appellant's negligence. It would also compensate him for decline in oil production on a portion of the royalty which he did not even own. Appellant is not liable for such decline in oil production. Appellant's points 13 and 14 are sustained. Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683; Burlington-Rock Island Railroad Co. v. Newsom, Tex.Civ. App., 239 S.W.2d 734; Standard Paving Co.

v. Pyle, Tex.Civ.App., 131 S.W.2d 200; City of Pampa v. Long, Tex.Civ.App., 110 S.W.2d 1001.

The judgment of the trial court is reversed and the cause is remanded.