**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant,**

v.

**Durward MAHON et al., Appellees.**

**No. 8177.**

Court of Civil Appeals of Texas, Amarillo.

Nov. 8, 1971.

Rehearing Denied Dec. 6, 1971.

McWhorter, Cobb & Johnson (Charles L. Cobb), Lubbock, for appellant.

Worley & Wright (Mike Worley), Wagonseller & Cobb (Robert L. Stogner) (Kent Wagonseller), Fred O. Senter, Jr., City Atty. (James P. Brewster), Lubbock, for appellees.

JOY, Justice.

This is a water flooding case in which the jury found that the defendant, The Atchison, Topeka and Santa Fe Railway Company, violated its statutory duty by constructing a roadbed for its railroad track without first providing the necessary culverts or sluices as the natural lay of the land required for the drainage of said land. The jury found that plaintiff Durward Mahon's property sustained damage proximately caused by the breach of said statutory duty by defendant, and after modifying the amount of the jury's verdict, the trial court rendered judgment for the plaintiff against the defendant Railway Company in the amount of $158,651.40. The City of Lubbock was also a party defendant in the lawsuit, but the jury acquitted the City of any acts of negligence and the trial court rendered judgment that plaintiff take nothing as against the City.

Affirmed.

From the trial court judgment for plaintiff-appellee Mahon, defendant Atchison, Topeka and Santa Fe Railway Company has perfected appeal to this Court and will hereinafter be referred to as appellant. The City of Lubbock appears in this Court as an appellee, taking the position that if the trial court judgment be modified in any way by this Court, nonetheless such modification or reversal should not affect that portion of the judgment of the court below absolving the City of liability.

Appellant constructed the particular roadbed with which this lawsuit is concerned during the years of 1917 and 1918. This track and roadbed run east and west, parallel to the Brownfield Highway. That particular portion with which this lawsuit is concerned lies between the Brownfield-Levelland "Y" (intersection of street leading from downtown Lubbock with highways leading to Brownfield and Levelland) on the east and just beyond the Quaker Avenue intersection with the tracks on the west. On the north side of the roadbed is a playa lake, one of several such lakes within the current Lubbock city limits, which lakes fill during periods of rainfall and then generally drain from the northwest to the southeast to other such lakes which may or may not be already filled. Appellee Mahon is the owner and operator of two apartment house complexes, the Normandy Terrace Apartment Complex, which is located on the west perimeter of the playa lake which is on the north side

of the appellant's roadbed, and the Orlando Apartment Complex, which is located about two blocks to the north of the same playa lake. Thus appellant's roadbed is constructed along the southeast perimeter, the Normandy apartments on the west perimeter of the same lake and the Orlando apartments several blocks to the north. When the lake fills it drains under the appellant's tracks by virtue of a culvert or sluice under a bridge constructed in 1917, the drainage being in a southeasterly direction.

On or about July 13, 1968, several of appellee Mahon's apartments were flooded when the playa lake rose due to heavy rains and escaped its normal bounds on the west side and to the north. Again, on or about September 18, 1969, flooding damaged several of appellee's apartments under similar circumstances.

On September 8, 1970, appellee Mahon filed suit against appellee City of Lubbock and appellant Atchison, Topeka and Santa Fe Railway Company for damages. In his third amended original petition, on which he went to trial, Mahon alleged that appellant had failed to comply with its statutory duty under Article 6328, Vernon's Annotated Civil Statutes, to provide the "necessary culverts or sluices as the natural lay of the land requires, for the necessary drainage thereof," when the roadbed was constructed in 1917. Further, Mahon alleged that appellant had breached a "continuing duty" under Article 6328 to maintain adequate drainage to prevent flooding. These alleged violations of statutory duty were, according to the petition, the proximate cause of the flooding incidents named in the petition, and, hence, the proximate cause of $31,000 damages to the interior of the apartments, $5,000 in loss of rents, and $125,000 in diminution in market value of the two apartment buildings, for a total

of $161,000 in damages. Mahon alternatively pleaded that the above breaches of statutory duty by appellant combined with the following alleged acts of negligence by the City of Lubbock so as to render the City and appellant jointly and severally liable for the damages: The City's action in decreasing the holding capacity of the lake by bringing in artificial fill to the area and extending Quaker Avenue from the south side of the roadbed across the roadbed and in a northerly direction to 19th Street; damming up the waters of the playa lake, by virtue of this fill, which retarded the flow of flood waters so as to cause them to back up into Mahon's apartments; and fixing a high water mark for building purposes at an elevation of 127.5 feet, City datum [1], when the City knew or should have known that this would be inadequate to prevent flooding in the area.

Mahon also sued the City on grounds that the above-mentioned acts of negligence amounted to a "taking" of property for public use without adequate compensation in contravention of the Constitution of Texas, Vernon's Ann.St.Const. art. 1, section 17.

Finally, Mahon asserted that appellant's negligence in allowing debris and trash to collect under its bridge, thus reducing the already inadequate runoff capacity of the bridge and drainage area, was negligence which was the proximate cause of the above-mentioned damages.

Appellant Atchison, Topeka and Santa Fe Railway Company and appellee City of Lubbock filed cross claims each against the other for contribution and indemnity, in addition to answering appellee-Mahon's allegations with both general and special denials and various defensive matters in separate answers.

---

[1]. "City datum" is an arbitrary set of figures used by the City of Lubbock to denote certain elevations within the City. Elevation zero is sea level 3,096.37 feet. The "City datum" figure is added to sea level 3,096.37 to arrive at the correct sea level. Thus, 127.5 city datum is sea level of 3,223.87 feet. All elevations in this opinion are city datum.

Trial was to a jury.

At the close of plaintiff's evidence, appellant moved for an instructed verdict based on the following defensive allegations: (1) the uncontroverted evidence shows that at the time the roadbed was constructed, in 1917, appellant provided a culvert, sluice or bridge as the natural lay of the land required for the necessary drainage thereof; (2) there is no credible evidence that there was any obstruction to the flow of water under the roadbed at the point of the bridge, and at the time of the flooding the low point of elevation of the culvert was below the natural high water mark of the playa lake in question; (3) the natural lay of the land has been changed since 1917; (4) the holding capacity of the original natural lake has been diminished by artificial fill placed therein and the changing of the original contours of the lake; (5) the apartments are located in a portion of the original lake area and in an area likely to be flooded, and plaintiff knew or should have known such condition at the time he purchased the property; (6) the contours of the area which drain to the lake in question have been changed by the paving of streets, building of residences and commercial buildings and overall development which changes have resulted in a greater volume of water being drained at a more rapid rate into the lake. The trial court overruled said motion. At the close of all the evidence, appellant renewed the motion on the same grounds, which motion was once again overruled.

This case was submitted to the jury on 29 special issues, some of which were conditioned on affirmative replies to the issues preceding them. The jury findings, material to this appeal and summarized corresponding to the order in which they were submitted, were that: (1) At the time the railroad in question was constructed in 1917, the appellant failed to provide the necessary culverts or sluices under its railroad as the natural lay of the land required for the necessary draining of the lake in question, taking into consideration such changes in topography, either natural or artificial, as would have been anticipated at that time by a reasonably prudent person; (2) and this failure was a proximate cause of the damages sustained by appellee Mahon; (3) the appellant did not fail just prior to the 1968 flood to keep its channel under the bridge free of debris and/or weeds, so that the flow of water was not impaired; (5) the appellant did not fail just prior to the 1969 flood to keep its channel under the bridge clear of debris and/or weeds so that the flow of water was not impaired; (7) the appellee City of Lubbock did not alter the natural course and flow of surface waters into the lake area as a result of the Quaker Avenue extension construction; (10) the City did not fix a high water mark for building purposes at an elevation of 127.5 feet; (13) the City, in constructing the extension of Quaker Avenue from 19th Street across the lake area in question to Brownfield Highway, decreased the effective water holding capacity of the lake area; (14) the City's action, in so decreasing the effective water holding capacity of the lake area, was not negligence; (16) the City of Lubbock in the exercise of ordinary care was not under a duty to establish a higher elevation than 18 inches above 127.5 feet for the floor level for construction in the area in question; (19) appellee Mahon did not fail to determine the drainage characteristics of the properties in question before he purchased them; (22) the insufficiency of the bridge opening in question to carry off flood waters on or about July 13, 1968, was not because some water which, according to the natural lay of the land, would not have flowed to the opening, was caused to flow thereto by artificial means; (23) the insufficiency of the bridge in question to carry off flood waters on or about September 18, 1969, was not because some water which, according to the natural lay of the land would not have flowed to the opening, was caused to flow thereto by artificial means; (24) the failure of

the appellant railroad to construct the necessary culverts and sluices was not the "sole proximate cause" of the damages sustained by appellee Mahon; (25) appellee Mahon did, after he had knowledge of flooding dangers, fail to take on his own property such measures as would fend his premises from high water; (26) such failure by appellee Mahon was not negligence; (28) (a) appellee Mahon sustained $1,960.00 in damages by way of reasonable and necessary cost of repairing furniture in the Normandy Terrace apartment complex, (b) $5,714.40 in damages for restoring the interior of those apartments, and (c) $68,000.00 in damages by way of diminution in market value to said apartment complex; (29) (a) appellee Mahon sustained $4,600.00 in damages by way of reasonable and necessary cost of repairing furniture in the Orlando apartment complex, (b) $14,777.00 in damages for restoring the interior of those apartments, and (c) $68,400.00 damages in diminution of market value to said apartment complex.

Appellant's motion to disregard the jury's answers to special issues nos. 1 and 2 because there was no evidence or insufficient evidence to support those findings, and for judgment notwithstanding the verdict, was overruled.

After finding that there was evidence to support the jury's finding to Special Issue No. 29(b) only to the extent of $9,977.00, the trial court modified the jury verdict to that extent and rendered judgment for Mahon against appellant Railroad Company in the amount of $158,651.40, but the trial court rendered judgment that Mahon take nothing as against the City. Appellant then appealed, assigning eleven points of error, to which appellee Mahon has replied in eleven counterpoints, and to which appellee City of Lubbock has replied in two counterpoints. The evidence pertinent to

the assignments of error may be summarized as follows:

This case concerns approximately one square mile of land and three playa lakes located within that area, all of which area was several miles to the west of the Lubbock city limits in 1917 when the railroad constructed its roadbed and railroad track. The area was taken into the Lubbock city limits in 1952 or 1953, and it is now a highly-developed residential and commercial section of the city.

In 1917, the area was ranchland; its principal use was cattle grazing, and with the exception of a few farms, it was, in the words of one witness, "cow country." The pasture land's three playa lakes will be referred to as follows: The northernmost lake is "Higginbotham Lake"; the lake with which this lawsuit is concerned and which was crossed by the railroad tracks in 1917 is "Lake 44"; and the southernmost lake into which both Higginbotham and Lake 44 drain is "Maxey Lake." As is even today characteristic of the approximately 130 playa lakes within the current Lubbock area, prior to 1917 the lakes drained from the northwest to the southeast, so that when heavy rains came to the area and the water in Higginbotham Lake reached a certain level, it overflowed in the direction of. Lake 44. When Lake 44's natural overflow elevation was reached by the water, it spilled to the southeast toward and into Maxey Lake. Unlike Higginbotham Lake and Lake 44, which are "overflow" lakes, Maxey Lake is a "hold" lake—that is, it is not a lake which generally reaches an overflow level and it is not expected to overflow to any other lake.[2] The elevations of the three lake bottoms were, according to the earliest topographic map produced by the City at the trial, aproximately 140 feet for Higginbotham, 126 feet for Lake 44 and 110

2. There. is, however, a 36-inch sewer line leading from the southeast perimeter of the lake in a southeasterly direction toward Tech Terrace Lake. The sewer line begins at elevation 113, so that Maxey need not overflow before drainage begins.

feet for Maxey. Higginbotham Lake's natural overflow point appears from evidence to have been approximately elevation 143.5 feet, while the natural overflow point for Lake 44 was about elevation 127.5 at the lowest point in the "overflow saddle." Therefore, when Higginbotham Lake overflowed, its overflow was added to the natural drainage of the Lake 44 area (the evidence disclosed that some 510 acres of land drained into Lake 44 by virtue of the topography of the area) and this water then filled Lake 44 (if it was not already full) until it reached an elevation of 127.5 feet, whereupon the water spilled into Maxey Lake. Lake 44 had an original storage capacity estimated at from 10 to 17½ acre feet of water in its natural state before its banks would overrun and the draining toward Maxey Lake begin.

In 1917, appellant Railroad constructed a roadbed along the highest point between Lake 44 and Maxey Lake, at elevation 128.5. The roadbed and rails of the track ran east and west, perpendicular to the natural overflow from Lake 44 to Maxey Lake, and the top of the rails were at elevation 133.5. The effect was to dam up Lake 44 as to its natural overflow to Maxey Lake. The Railroad cut a sluice through this roadbed so as to allow the overflow waters to drain to Maxey Lake, and a 14-foot bridge with the 11½ foot-wide sluice allowed the tracks to continue to drain in that manner.

It was the testimony of expert witnesses that the natural lay of the land in 1917, before the railroad roadbed was built, and

in 1949, after the roadbed had been in place for some 32 years and the development for housing was still in its early stages, was such that Lake 44's natural boundaries extended to elevations of between elevation 127 and 128 feet. In other words, when the railroad built its roadbed across a slight ridge in between Lake 44 and Maxey Lake at elevation 128.5, the natural boundaries of Lake 44 in its normal, unflooded state were not affected. The estimated natural boundary of Lake 44 in the 1917–1949 period takes in what would now be appellee Mahon's Normandy apartments on the lake's western boundary and it may or may not take in the Orlando apartments on the northeast side.[3]

The estimated capacity of Lake 44 at this normal boundary in 1917 was estimated at between 10 acre feet and 17½ acre feet. Although there is no direct testimony as to the size of the "natural overflow saddle" or "lip" over which Lake 44 drained in 1917 toward Maxey Lake, the topographical map of the area and the testimony regarding Higginbotham Lake and other overflow lakes in the Lubbock area shows that in all probability, the natural overflow saddle for Lake 44's drainage into Maxey was as much as one third of the size of the entire lake in width. The overflow saddle of Higginbotham Lake was shown to have taken up some two blocks or one-third of the width of that lake in its entirety. The "Sub-Grade Profile Map" introduced by the appellant Railroad also indicates that the natural overflow area of Lake 44 was

---

3. Although there is testimony by witness Lance which appears to show that various current structures on the north side of 19th Street are within what was once the "natural boundaries" of Lake 44, this testimony was at least partially based on the unnatural, flooded boundaries as depicted in a photograph of the 1949 flood of the area, such photograph having been marked Exhibit "DR-7." Witness Lance also testified that his reading of the topographic map introduced as Exhibit "DR-8" would place Mahon's Orlando Apartments within the "original lake area," but

from his discussion of the photograph marked Exhibit "DR-7," it is evident that he considered the natural contour of the lake to end at elevation 128. Mahon's Orlando Apartments are not within elevation 128, according to the topographic map, "DR-8." The testimony of the witness Vaughn, who lived in a house on 19th Street (Levelland Highway) for some twenty years, (1939–59), established that the northern boundary did not extend beyond 19th Street unless the Railroad's bridge was "stopped up."

a large, gradually sloping saddle as opposed to a radical "V" shape.

In 1917, when this 510-acre area which drains into Lake 44 was largely pasture land, the amount of rainfall which would run off was about 20–25%, according to the Texas Highway Department Manual on drainage computation. The witness Nelson, a licensed engineer employed by the City, testified that this meant that as an accepted standard, average pasture land should have a runoff of about 20–25% of what rain falls on it. (The percentages rise rapidly commensurate with development for homes to 50–70%, thus increasing the runoff.) Of course the rate at which the rain falls is a significant factor, and calculations were made by expert witness Nelson which took into account the amount of time it would take for pasture land to absorb all the moisture which it can absorb under a rainfall of an intensity not expected to occur more often than every 50 years. Nelson calculated that a very intense rain (a rainfall not likely to occur more than once every 50 years) on sloping pasture land such as that involved in this case would produce a runoff maximum of about 425 to 450 cubic feet of water per second, which would reach Lake 44 and its roadbed bridge and sluice. Of course when Higginbotham Lake overflowed, the drainage from that lake would be added to this figure.

All of this water would drain toward the 11½-foot wide sluice· constructed by the Railroad. The "Sub-Grade Profile Map" previously mentioned indicates that the railroad had constructed at least two other sluice bridges for the same railroad track, one some 4,000 feet in one direction and the other 3,200 feet in the other direction from the Lake 44 sluice bridge. These bridges were 19 and 28 feet wide as compared to the 14 foot bridge over the Lake 44 sluice, and allowing for the thickness of the timbers in each of the bridges of about 2½ feet, the openings beneath the other two bridges were 16½ and 25½ feet wide. However, the map, as interpreted by an of-

fice engineer for the appellant Railroad, showed the 11½-foot Lake 44 sluice to have been constructed at the lowest natural land elevation of the three sluices.

It was the testimony of several expert witnesses that the "rate" of flow of the drainage water toward and through a sluice such as that constructed for Lake 44 is the important factor in foreseeing a backup of flood waters. Likewise it was established that the holding capacity of Lake 44 would become irrelevant once the flood level was reached at the lake, and that considering the area to be drained by Lake 44 and the volume of water which could be anticipated in a heavy rain on the area, rate of flow through the drainage sluice would be the important factor in determining when flooding would occur. Several witnesses testified that, at various stages in the development of the area surrounding the lake, the "rate of flow" of drainage from Lake 44 to Maxey Lake was retarded by the railroad sluice. Witness Nelson testified that in 1917 the roadbed impeded the rate of flow of natural drainage of the area, and that his calculations indicated "more flow would be arriving than could go through the culvert." Witness Lance reaffirmed Nelson's calculations in an indirect manner, testifying that since in 1917 the area was a moderately sloping grazing land, *"there was no way that the railroad could be damaged or there was no one to be damaged alongside, therefore, it was adequate* and any larger grade probably would have been turned down by higher headquarters anyway." Lance made his calculations on the basis of a 30-minute rainfall of 1.7 inches, with 50 per cent runoff, arriving at a total of 240 acre feet total rainfall. He estimated that the sluice in question would drain water at the rate of 350 cubic feet per second, "which would lower the thing in a very reasonable length of time, which at that time *was adequate, since it wasn't doing anything except irrigating some pasture land."* Lance further testified, when asked if in 1917 the bridge would have caused the water in the lake to back up, as fol-

lows: *"Oh, it would have backed up in that land but it wouldn't have caused any damage."* It appears from Lance's testimony that his judgment that the sluice was adequate in 1917 was based on the premise that if only grazing land was flooded by the inadequacy of drainage, the drainage was therefore adequate. Lance's estimate that the sluice would drain 350 cubic feet per second is directly contradicted by witness Nelson's testimony that the effective flow through the sluice would be 260 cubic feet per second when the water level was at elevation 130 as it was in the two floods involved. At elevation 128, the natural overflow level, Nelson calculated that the sluice would drain 93 cubic feet per second.

There was no contradiction of Nelson's estimate of 425–450 cubic feet per second maximum runoff from the area drained by the sluice, or the statement that Higginbotham Lake's overflow would add to the drainage figure. Yet the effective drainage capacity of the sluice was a controverted figure between 350 and 93 cubic feet per second.

There was testimony that in 1949 the same area was flooded as in this case, and that the drainage was inadequate due to the railroad's sluice. In 1949 there was evidence of slight development of the area north of Lake 44 and only a "small amount" of fill had been brought from the lake bottom to build up witness Vaughn's property.

Between 1950 and the present, several "artificial fills" have been used to build up the area which drains into Lake 44, and the area was transformed into a residential and commercial area with paved streets. In general, the area has become one of low moisture absorption with as much as 80–90% runoff. Witnesses also testified that the speed of the runoff increased with the paving of streets and the buildup in elevation which took place in some areas. After these significant changes in the topography of the drainage land north of Lake 44 and between 1949 and 1967, flood-

ing in 1967 again caused damage to the area with the Greenbriar Apartments sustaining water damage. Appellee's apartments went unharmed.

It was estimated that the 1968 and 1969 floods were the result of runoff water flows of 600–700 cubic feet per second, a flow increase of several hundred cubic feet per second over the 425–450 maximum set for 1917 by witness Nelson. Part of this runoff may well have been due to overflow from Higginbotham Lake. The increase was also attributed partly to the change in topography north of Lake 44 which occurred between 1949 and 1967. It was estimated that it would have required a 70-foot opening (instead of the 11½ foot opening) to drain the lake so as to keep it at an elevation below 129 and to prevent flooding in 1968 and 1969.

When the City built Quaker Avenue through the middle of Lake 44, during the last six months of 1968, the capacity of the lake was varied, but the issue as to whether the capacity was increased or decreased is controverted. Appellant's witness Lance estimated the current storage capacity at 12 acre feet of water, as compared with the 10 to 17½ acre feet in 1917. City data showed the current storage capacity to be 17 acre feet because according to their figures more of the lake bottom was removed than was placed below the water line during the extension of Quaker Avenue and in other "cut and fill" operations. Witness Nelson's figures showed 22 acre feet in present storage capacity. Nelson testified that the City took out 1,342 cubic yards of fill below the 127.5 overflow line and placed 867 cubic yards of fill back into the lake for the roadbed below the overflow line. A culvert under the roadbed of Quaker Avenue and a sagging in the road allowed waters to cross under and above Quaker without significant retardation of the flow of water from one side of the lake to the other. A temporary dyke was placed in the lake to divert waters while the digging took place, but the dyke was not shown to have significantly retarded

the waters. The dyke was removed in the late months of 1968 after the road was completed. The jury, in Special Issue 13, found that the effective water holding capacity of the lake area was "decreased" by the extension of Quaker Avenue.

It was the testimony of several witnesses that once the capacity of the lake was reached and overflow began, the capacity of the lake was not relevant to the rate of drainage and flooding, since several hundred acre feet of water would drain toward the sluice and the lake's capacity was at most 22 acre feet.

■ Appellant's first three points of error attack the trial court's refusal to grant judgment non obstante veredicto for appellant on the grounds that: (1) the jury findings are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust; (2) such findings were based on "no evidence"; and (3) reasonable minds not burdened with prejudice could not differ under the evidence that the Railway did not fail to meet its statutory duty under Article 6328. We overrule these three points. We find that there is some evidence of probative force that in 1917 at the time the railroad in question was constructed, the appellant "failed to provide the necessary culverts or sluices under their railroad as the natural lay of the land required for the necessary draining of the lake in question, taking into consideration such changes in topography, either natural or artificial, as would have been anticipated at that time by a reasonably prudent person," and there is some evidence of probative force that such failure was a proximate cause of appellee Mahon's damages. There was ample testimony to support the jury's findings that the railroad's culvert was inadequate to allow the necessary drainage of the land in 1917, that the inadequacy of the culvert when combined with the topographical changes since 1917 in the area drained by the lake, caused water to back up in Lake 44 and to reach an elevation of 130.5 feet before it passed through the sluice in 1968 and again in 1969, and that this was a proximate cause of the flooding of appellee Mahon's apartments—both of which apartments were at their lowest level 129.8 in elevation. Therefore, a judgment n. o. v. would not have been proper. Texas and New Orleans Railroad Company v. Barnhouse, 293 S.W. 2d 261, 264 (Tex.Civ.App.—San Antonio 1956, writ ref'd n. r. e.). Further, considering all of the evidence, the finding by the jury that appellant failed to construct the necessary culverts or sluices as the natural lay of the land required and that such failure was the proximate cause of appellee's damages, is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. Direct qualified expert opinions based on calculated engineering data, topographic maps and photographs and the statements of laymen directly involved in the work in the area at the time of the floods are supportive of the finding. There is evidence that the violation of the statutory duty imposed upon appellant would have resulted in a very little in damages to the pasture land if a flood was caused by it in 1917. And there is evidence that subsequent development in the area which drains to the lake and development in the area immediately surrounding the lake has increased the likelihood of damages in the event of such flood. There is evidence that the development of the area which drains to the lake was a contributing factor in the instant floodings. But there is direct evidence that 425–450 cubic feet per second of water can be expected to drain from acreage such as that involved in this case in 1917 during a heavy rain, and that this amount would very likely be increased by overflow from Higginbotham Lake. There is direct evidence that the sluice constructed by the railroad would carry a maximum of 260 cubic feet per second, and that the area flooded in 1949 before the massive development of the drainage area had increased the flow amount or speed to the sluice to any significant degree. There is an admission by appellant's

own expert witness that water would back up even in 1917, but that the harm done would be negligible because the land was only pasture land. Appellant's own expert witness did not contradict the estimate that 425–450 cubic feet per second could be expected to drain into the lake from the 1917 pasture land, or that Higginbotham Lake overflow would add to that amount, but he set the amount which could be carried off by the sluice as the natural lay of the land required at 360 cubic feet per second. There is direct evidence that the 11½-foot sluice was constructed between two others which were 16½ and 25½ feet in width yet which were located at higher elevations. And there is ample evidence that the inadequate drainage at the sluice was a proximate cause of the floodings which caused the damage to appellee's apartments. We have weighed the evidence supporting the verdict along with the other evidence in the case, including that which is contrary to the verdict, and we conclude that the verdict is not against the great weight and preponderance of the evidence, and we therefore overrule the point. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). For the same reasons, we overrule appellant's third point.

■ Appellant's fourth point of error assigns as error the trial court's submission of Special Issue No. 1 for the reason that said issue "inquires as to two ultimate facts, first as to whether the culvert in question was constructed as the natural lay of the land required for drainage of the lake in question, and two, as to whether at the time the said culvert was constructed this Defendant should have anticipated its adequacy according to the criteria of a reasonably prudent person looking into the future." The special issue, which was answered in the affirmative, reads as follows:

"SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that at the time the railroad in question was constructed in 1917, the defendant railroad company failed to provide the necessary culverts or sluices under their railroad as the natural lay of the land required for the necessary draining of the lake in question, taking into consideration such changes in topography, either natural or artificial, as would have been anticipated at that time by a reasonably prudent person?

"Answer: 'They failed' or 'They did not fail'.
"ANSWER: They failed.            ."

Rule 279, Texas Rules of Civil Procedure, requires the trial court to submit the *controlling* issues made by the written pleadings and the evidence . . . .." Thomason v. Burch, 223 S.W.2d 320 (Tex. Civ.App.—Fort Worth 1949, writ ref'd n. r. e.). A "controlling special issue" has been defined as a question which inquires as to the truth of a proposition of fact which constitutes a component element of a ground of recovery or of defense, and which, when answered, would have an effect upon the judgment. Mayflower Investment Company v. Stephens, 345 S.W.2d 786, 789 (Tex.Civ.App.—Dallas 1960, writ ref'd n. r. e.); Vol. 3, McDonald, Texas Civil Practice, § 12.06.1 at 281–2 (1970 rev. ed.). Rule 277 requires such issues to be submitted separately and distinctly.

In essence, it appears to be appellant's contention that it was entitled to a separate submission of the two grounds of recovery it contends is embraced in the issue. Since the issue imposed on appellee a more onerous burden than the law requires, we can see no error harmful to appellant in the special issue as it was presented to the jury. To recover, appellee Mahon was required to secure a finding that the railroad company failed to provide the necessary culverts or sluices under the railroad as the natural lay of the land required for drainage of the lake in question. Article 6328 makes absolute the duty of the railroad company to construct a sluice as the natural lay of the land required and if it

fails to meet that duty it is responsible for the damages incurred. The Atchison, Topeka & Santa Fe Railway Company v. Porter, 411 S.W.2d 615, 617 (Tex.Civ.App. —Amarillo 1967, writ ref'd n. r. e.). By adding the additional qualification, the trial court imposed a heavier burden on appellee since, to have secured the affirmative answer entered by the jury, appellee was required to convince the jury in both particulars. Under these circumstances, we are not of the opinion that the error, if any, amounted to such a denial of the rights of the appellant as was reasonably calculated to, and probably did, cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure; Daniel Lumber Company v. Settlemire, 256 S.W.2d 922, 926 (Tex.Civ.App.— Beaumont 1953, writ ref'd n. r. e.).

■ Appellant's fifth point of error asserts that because the jury found in answer to Special Issue 13 that the City of Lubbock, in extending Quaker Avenue through the lake area in question, decreased the effective water-holding capacity of the lake, therefore the trial court was in error in assessing all damages for the flooding against appellant. Assuming that there was sufficient evidence to justify the jury's finding of a decrease in holding capacity of the lake, even though it appears to this Court that the weight of the evidence is contrary to such finding, several expert witnesses testified that the controlling factor in the flooding was the rate of flow of water through the sluice after the holding capacity of the lake was reached. Both witnesses Nelson and Lance testified that 175 acre feet of water could be expected to drain into the lake during a heavy rain— the maximum difference in holding capacity of the lake justified under any evidence would be approximately 7 acre feet. Under these facts, witnesses Nelson and Professor Wells testified that the holding capacity of the lake would soon become irrelevant and that the important and controlling factor as to flooding would be the "rate of flow" out of the lake. The jury, in Special Issue 14, answered that the City's action in decreasing the holding capacity was not negligence, and appellant has not argued to this Court that any statute makes the City negligent per se by virtue of its action. For the above reasons, we overrule appellant's fifth point.

■ Appellant's sixth point of error complains of the trial court's refusal to submit requested special issues inquiring as to whether appellee-Mahon's apartments were built in a portion of what was the original lake area and whether the flooding on the dates in question was due to their being so situated. The appellee does not dispute that the apartments are located within what was originally the lake area. The original contours of the lake (including the overflow saddle) have been changed by construction of the railroad roadbed and the deepening of the lake in certain areas and filling it in in other areas. But the great weight of the evidence shows that the holding capacity of the lake was not diminished by the "cut and fill" operation performed on the lake, deepening parts of the lake and filling in others. Appellee's apartments were not located within the contours of the lake at the time of the flood, having been constructed on built-up land several feet above the overflow level of the lake. And, as has already been discussed, the determining factor as to flooding of the area was the rate of flow of water out of the lake southeastward. In all of the cases cited by appellant in support of his issues, the land upon which damages occurred was low land which would have flooded regardless of the railroad's roadbed. These cases are not controlling in the instant case, and we overrule appellant's sixth point.

■ Appellant's seventh point alleges error in the trial court's refusal to submit its requested Special Issues 7 and 8 inquiring as to whether the waters which flooded plaintiff's properties on the dates in question had been diverted from their natural flows by manmade structures. We

find no error harmful to appellant in the trial court's failure to present these issues, as an answer favorable to appellant would not have required a different judgment. It would have been necessary for appellant to submit issues following his requested issues 7 and 8 inquiring if either of the diversions, if one was found, was a proximate cause of the damages sustained by appellee or, in the language of the statute argued as authority for such a defense, that such diversion was "to the prejudice of any person or property situated within the watershed from which such water is proposed to be taken or diverted." Article 7589, Vernon's Annotated Civil Statutes. The requested issues merely inquire as to whether the surface waters which flooded the appellee's properties "flowed into the area after having been diverted from their natural flows by manmade structures." They do not inquire as to whether "by virtue" of any such diversions, the surface waters flooded the appellee's properties— this is the crux of the issue. It is only prejudicial diversion of water which is prohibited by such statutes, Texas Co. v. Burkett, 117 Tex. 16, 296 S.W. 273, 276 (1927); Article 7589, Vernon's Annotated Civil Statutes, and the requested special issues do not properly put appellant's proposed defense before the jury and they are not in substantially correct form as required by Rule 279, Texas Rules of Civil Procedure. We overrule appellant's seventh point.

■ Appellant's eighth point assigns as error the trial court's refusal to grant its motion for instructed verdict on the grounds that the apartments were located in a portion of the original lake area and the contour lines of the area have been changed and altered resulting in a change of the natural flow of surface waters. For the reasons discussed in overruling appellant's sixth point, we are of the opinion that this point is without merit. However, if the reasons there stated are not sufficient to compel an overruling of both the sixth and eighth points, the case of Texas

and New Orleans Railroad Company v. Barnhouse, supra, 293 S.W.2d held at pages 264–265 that the railroad must meet changes in conditions and that failure to do so will not excuse the railroad for failing to maintain proper sluices.

■ In appellant's ninth point of error, the jury findings on damages are attacked as being based on "no evidence." This Court is bound by the jury's findings if there is any evidence of probative force to support the finding, In Re King's Estate, supra, 150 Tex. at 664, 244 S.W.2d 660, and in making this finding, "it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature." Renfro Drug Company v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 613 (1950). Appellee Mahon, who was shown to be familiar with the cost of repairing furniture in Lubbock County by virtue of his furniture leasing company, testified that the reasonable cost of having 1,312 damaged furniture legs picked up, sanded, cleaned, and sprayed would be $6,560.00 or $5.00 per leg. The jury believed this testimony and awarded $1,960.00 in Special Issue No. 28(a) for the furniture damaged at Normandy Terrace and $4,600.00 in Special Issue No. 29(a) for the Orlando furniture. Appellant attacks Mahon's testimony as "unbelievable"—but it introduced no conflicting evidence at the trial nor does it state upon what grounds it argues the testimony to be "unbelievable." Under this state of the record, we do not feel disposed to disturb the jury's finding of a total of $6,560.00 in furniture repair damages.

■ Mahon testified that the necessary recarpeting with the same grade of carpet of 592 square yards of the Normandy apartments would cost $4,114.00 ($6.95 per square yard) and that the necessary repainting of eight damaged units would cost $1,600.00, for a total of $5,714.00 for interior repairs to those apartments. The jury responded in Issue No. 28(b) with

$5,714.00 in interior repair damage. Mahon further testified that the necessary re-carpeting of 860 square yards of the Orlando apartments would cost $5,977.00 ($6.95 per square yard) and the necessary repainting of twenty damaged units would cost $4,000.00, for a total of $9,977.00 for interior repairs to those apartments. The jury responded in Issue No. 29(b) with $14,777.00 in interior repair damage, which amount was reduced to $9,977.00 by the trial court. Mahon testified that his figures were for the units under water during the flood only and that the above recarpeting and repainting costs were reasonable and cheaper than the usual cost he had observed in his apartment business dealings because of the volume. Appellant attacks the basis for the jury's findings as "unclear." But appellant nowhere in its brief points to any conflicting evidence nor does it state upon what grounds this court should disregard the jury's findings.

As to permanent damage to the apartment house units as the result of the floods, Mahon testified that once it was known that an apartment house unit was subject to flooding, prospective buyers "don't even want to talk with you" about buying it. The City Tax Equalization Board devalued Mahon's properties by ten per cent (10%) as the result of the floods. Appellee Mahon testified that the Normandy Terrace, excluding storerooms, is twenty-two thousand eight hundred and forty-eight square feet (22,848), and that the Orlando apartment house unit is twenty-two thousand eight hundred square feet (22,800). Mr. Jack Wright, insurance agent, apartment house builder, and apartment house owner, testified that the fair market value of these apartment house units before the floods would have been between thirteen (13) and fourteen (14) dollars per square foot, taking into consideration the square footage of floor area, including first and second floors. He further testified that after the floods, these two apartment houses in Lubbock County

have been greatly reduced in value by the fact that they do flood. He stated that in his opinion a reduction of ten dollars ($10.00) a square foot would be conservative. He further testified that as a result of the fact that it was known among prospective buyers that these apartment house units flooded that it had the effect of limiting the number of prospective buyers. He further testified that before the floods he would have been a prospective buyer for these apartment house units but that after the floods he would not be a prospective buyer. Thus, the market value of the apartments was set at approximately $300,000 each before the flooding by a competent witness whose testimony was uncontradicted. The jury found that the diminution in market value of the apartments was in the sum of $68,000 for the Normandy Apartments, $68,400 for the Orlando Apartments. Point nine is overruled.

Appellant's tenth point of error asserts that, by virtue of the judgment rendered on Special Issues 28(a), (b) and (c) and 29(a), (b) and (c), appellee was allowed a double recovery. We overrule this point. The special issues dealing with the difference in market value by virtue of known flooding tendencies, 28(c) and 29(c) asked the jurors to assume that the necessary furniture and interior repairs, if any, inquired about in parts (a) and (b) had been completed. For this and other reasons, the case of Tyler S. E. Ry. Co. v. Hitchins, 26 Tex.Civ.App. 400, 63 S.W. 1069 (1901, no writ), cited by appellant, is not in point. In that case, the plaintiff did not plead damages to personalty or specific items attached to the realty separate and apart from the diminution in market value of the realty, and the court properly disallowed him a recovery based on such items—holding him instead to a measure of damages based on the sole damages he pleaded, that is, diminution in market value. Appellant cites General Crude Oil Company v. Aiken, 335 S.W.2d 229 (Tex.Civ.App. Eastland 1960, reversed on other grounds, 162 Tex.

104, 344 S.W.2d 668), but we find this to be a case wherein the plaintiff was held to have wrongfully recovered for mineral damages he did not own because of the framing of his damage issue in terms of the land "as a whole."

Appellant's eleventh and final point of error complains of the trial court's substitution of its finding of $9,977.00 for the jury's finding of $14,777.00 in answer to Special Issue No. 29(b). For the reasons set out in overruling appellant's ninth point of error we find that there was ample evidence to support the court's substituted finding. It is appellant's contention that since a formal motion for judgment n. o. v. was not filed by appellee, and since the trial court proceeded to enter judgment as prepared by appellee wherein one finding of the jury was modified from $14,777.-00 to $9,977.00, therefore the entire verdict fails because a part of it was set aside. In effect, when appellee submitted his proposed judgment, with the reduced figure of $9,977.00 instead of $14,777.00, to the trial court, he submitted a remittitur to that court of the excessive damages. The power of a trial court to determine the propriety of a remittitur under Rule 328, Texas Rules of Civil Procedure, is governed by the same standards as is a Court of Civil Appeals' power to order remittitur on appeal. Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835, 840 (1959); Berne v. Keith, 361 S.W.2d 592, 604 (Tex.Civ.App.— Houston 1962, writ ref'd n. r. e.). The above cases require that sound judicial discretion must be exercised by the trial court in allowing such a remittitur, and we find no abuse of discretion by the trial court in allowing the appellee to remit the excess of the jury verdict above that amount that the evidence in the case disclosed appellee was entitled to.

The judgment of the trial court is affirmed.

ELLIS, C. J., not sitting.

