**Lloyd R. BLUME et al., Appellants,**

**v.**

**James C. WEAVER et al., Appellees.**

**No. 4084.**

Court of Civil Appeals of Texas.

Eastland.

Jan. 20, 1967.

Heath & Robinson, Bob Heath, Houston, for appellants.

Fuhrhop & Green, John R. Green, Dickinson, for appellees.

COLLINGS, Justice.

James C. Weaver, individually and as next friend for Michael Weaver, a minor, and his wife Lorraine W. Weaver, brought suit against Lloyd R. Blume, Lowell R. Blume and Linton Building Company, Inc. Plaintiffs alleged that defendants had contracted to construct a dwelling in a good and workmanlike manner and in accordance with an agreed plan, including provisions for central heating and air conditioning; that there was an improper construction of the house and of the central heating unit by the defendants or their subcontractors, wherefore, plaintiffs sought damages for an alleged breach of contract to correct such defects. Plaintiffs also sought damages for alleged physical pain and mental suffering by reason of carbon monoxide poisoning or intoxication sustained by plaintiffs because of the improper construction of the central heating system. The case was tried before a jury and based upon its findings, judgment was rendered against the defendants Lloyd R. Blume and Lowell R. Blume for damages on both counts. All relief sought against Linton Building Company, Inc., was denied. Lloyd R. Blume and Lowell R. Blume have appealed.

The record shows that appellants entered into a written contract with Mr. and Mrs. Weaver to sell them a certain tract of land and to construct thereon a dwelling in accordance with an agreed plan. The evidence further shows that the Weavers fully complied with their obligations under the contract by certain payments of money, the execution of a vendor's lien note in the sum of $13,100.00 and a deed of trust on the property. Appellants acted as general contractors on the construction job and some of the work was let by them to subcontractors. In connection with appellees' claim for damages by reason of carbon monoxide poisoning because of improper construction of the central heating system the jury found that James C. Weaver, Lorraine Weaver and the minor, Michael Weaver, suffered injuries in December, 1962, and January 1963; that such injuries resulted from monoxide intoxication; that the furnace installed in the Weaver home gave off carbon monoxide gas which escaped into the house; that the giving off of such carbon monoxide gas resulted from the manner in which the furnace was installed; that the manner of the installation was negligent, and that such negligence was a proximate cause of the injuries suffered by the Weavers. The jury further found that the amount of money, if paid in cash, which would reasonably compensate the Weavers

for their injuries proximately resulting from the inhaling of such carbon monoxide gas was as follows: James C. Weaver, Five Hundred Dollars; Lorraine Weaver, Eight Hundred Dollars, and Michael Weaver, One Hundred Dollars. In their points 19 through 39 appellants complain of the lack of pleadings and the lack and insufficiency of the evidence to support such findings.

■ We sustain appellants' points complaining of the insufficiency of the evidence to support the findings that the furnace in the Weaver home gave off carbon monoxide gas and that the injuries sustained by appellees resulted from carbon monoxide intoxication. The testimony concerning carbon monoxide poisoning and the injuries alleged to have resulted to appellees therefrom came from three witnesses, appellees, James Weaver and wife, Lorraine Weaver and Mr. James R. Gant. Mr. and Mrs. Weaver testified, in effect, that in November of 1962, two months after moving into the house in question, the weather became cold enough to turn on the furnace; that after the furnace was turned on and the nights began to be cold members of the family would wake up in the mornings with headaches, dizziness and nausea; that such conditions were particularly apparent when it was so cold that the heater was burning a great portion of the night; that when the nights were not so cold or when they turned the thermostat down so that the furnace would not operate so much they were not bothered by headaches, dizziness and sickness, but, if in the morning they turned the thermostat up so the furnace would begin to burn again, the nausea, dizziness and headaches would reappear; that, particularly in the back bedrooms and bath, one's head would begin to ache within a short period of time and there would be nausea and dizziness. Mrs. Weaver stated that on some occasions she got up with a headache and went out of the house to her clothes line and the fresh air always made her feel better. She also stated that on mornings when her husband woke up with a headache and nausea which continued until he went to work that he would feel better after he left the house and got to his work. Mr. and Mrs. Weaver both testified concerning the condition of their son who occupied a back bedroom. They stated that one night while the furnace was on they heard their son calling and went back to see about him; that his lips and fingernails were blue; that he complained of a bad headache and was very sick and dizzy; that on one occasion he began feeling bad as he sat at his desk; that when he went to his closet and reached up on the shelf for something he felt even worse and went to his bed. The boy's condition was such that the parents were alarmed and carried him to Galveston County Hospital where he was examined and treated by a physician. He was so ill that his parents had to support him to get him into the car. The visit to the hospital was on Saturday night January 12th and the boy continued to be sick and dizzy and suffer from headaches until Monday when the Weavers took him to their family physician. The Weavers testified that their physician could not determine the cause of their son's illness; that it was evident that the boy was ill but the doctor was unable to determine what was causing it; that the doctor did not at that time recognize the boy's condition as anything that he could identify. Mr. and Mrs. Weaver testified that during this period they also suffered greatly from nausea and headache.

The evidence indicates that the trouble with headaches and sickness lasted through the winter of 1962–'63 and part of the next winter. Mrs. Weaver testified that it appeared to her and her husband that the trouble was connected in some way with the central heating furnace although they couldn't smell any gas; that on several occasions they considered the possibility that it might be something in the air they were breathing. In any event the matter caused them much concern, worry and strain. The Weavers left the bedroom windows open at night and took turns staying awake. Sometimes they turned the furnace off, even

when it was very cold. They noted that when the furnace was off there were no illnesses, but when the furnace was turned on headaches and nausea returned. Sometimes when it was cold the Weavers had to wear coats in the house because they were afraid to trust the furnace.

Mr. Jim Gant was district manager for Lennox Industries, Inc., which company installed the central heating unit in the Weaver home. Mr. Gant came to the home of the Weavers to inspect the furnace two or three times during October 1963. His visit and inspection was in response to a letter written by the Weavers to his company. He stated that the purpose of his inspection was to determine if the unit had been installed properly and in accordance with good practice. He stated that Mrs. Weaver at the time mentioned the possibility of carbon monoxide gas being emitted by the furnace into the interior of the house; that he inspected the furnace and equipment and found that it was installed in accordance with good practice and as recommended by the manufacturer. He stated that under his direction tests were made by an expert technician to determine whether carbon monoxide gas was being emitted from the furnace into the interior of the house. He testified that all of these tests were negative; that in his opinion the inspection showed that there was no possibility of carbon monoxide gas entering the interior of the house because of the use and operation of the furnace.

Defendants exhibit number 3 is a letter written by the Weavers to Lennox Industries, Inc., complaining about the furnace. The second paragraph reads as follows:

"The furnace on numerous occasions last winter blew out a gaseous substance we believe to be carbon monoxide into the house and caused us to become violently ill. We spent many very cold nights without any heat because we were afraid we would be asphyxiated in our sleep."

Appellees contend that the above quoted portion of defendants' exhibit number 3, which was introduced by appellants without limitation or qualification, binds appellants and that such evidence is, in effect, a conclusive showing that there was carbon monoxide emission which caused the injuries complained of by appellees. We cannot agree with this contention. It is true that where a party to a law suit introduces written evidence without limiting its purpose he is bound by the recitations of fact therein. The recitation of fact in appellants' exhibit number 3 was that the Weavers believed that carbon monoxide gas was being emitted into the house. The fact that they believed carbon monoxide gas was coming into the interior of the house from the furnace was only an opinion and did not establish conclusively that such gas was coming into the house as they believed.

Appellees admit that the only direct testimony that the symptoms of the Weaver family, such as headaches and nausea, were symptoms of carbon monoxide poisoning was the testimony of the Weavers concerning statements made to them by Doctor Mantooth. Mrs. Weaver testified that Doctor Mantooth told her that such symptoms were the exact symptoms of carbon monoxide intoxication, and that he diagnosed the condition of her son as being the result of carbon monoxide poisoning. The testimony of the Weavers concerning such statements and diagnosis by Doctor Mantooth was hearsay and not admissible to show that the symptoms of the Weavers were symptoms of carbon monoxide intoxication or that their son was suffering from carbon monoxide poisoning. Even though such testimony was not objected to it was hearsay and constitutes no evidence of probative force to establish such facts. Knapik v. Edison Bros., Inc., 313 S.W.2d 335 (CCA 1958), error refused; Texas Company v. Lee, 138 Tex. 167, 157 S.W.2d 628 (Sup.Ct. 1941).

For the reasons stated, that portion of the judgment for appellees for personal injuries should be reversed and remanded because of the insufficiency of the evidence. Even if, as appellants contend, it should be

held there is no evidence to support such findings we feel that the matter has not been fully developed and that the ends of justice require a remand instead of a rendition of that part of the judgment.

In answer to special issues 13 through 18 it was found by the jury that the plumbing, roof and interior finish in the Weaver home were not installed and completed in a good and workmanlike manner and there were findings of the amount of expense required to correct such defective construction. Appellants' points 40 through 55 urge that there was no evidence and insufficient evidence to support such findings and that the court erred in not disregarding same and entering judgment for them non obstante veredicto. These points are not well taken. Both Mr. and Mrs. Weaver testified to numerous material defects in the construction of the house. There was testimony and estimates by qualified plumbers and builders concerning such defects and the cost of necessary repairs. The witness Johnny Arolfo was a building contractor who had been in the business about 12 to 14 years. He stated that about ninety percent of his work was in residential construction; that he would build an average of about 15 to 20 houses a year and that he was contacted by the Weavers and went to their house and examined it. He testified at length concerning defects in the house, set out in approximately 150 pages of the Statement of Facts. Contrary to appellants' contention Arolfo's testimony concerning the cost of repairs of such defects was not hearsay and of no probative force because he relied upon the assistance of helpers in arriving at the estimates made. He was an experienced contractor. He personally examined the house and the defects involved. His opinion and estimates of the damages were admissible and had probative value. Appellants, themselves, placed in evidence their exhibit number 2 which is an estimate by a qualified plumber of the amount of expense required for repairs to the plumbing in the Weaver house. They also placed in evidence their exhibit number 5 which is an estimate by Arolfo of the cost of repairs

to the roof and the interior finish. The evidence amply supports the findings complained of in these points. They are overruled.

As heretofore noted, that portion of the judgment for personal injuries sustained by appellees must be reversed and remanded. We find no reversible error in any of the points complaining of the judgment for the Weavers for the cost of correcting and completing the improper construction of their home. However, a partial reversal as authorized by Rule 434, Texas Rules Civil Procedure may be had only where issues are severable. 4 Tex. Jur.2d 459; Waples-Platter Co. v. Commercial Standard Insurance Company, 156 Tex. 234, 294 S.W.2d 375 (1956); Harder v. Sanders, 155 Tex. 149, 284 S.W.2d 144 (1955); Texas Employers'.Insurance Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929 (1942).

It is held that the test of whether issues as to which reversal is required are severable is whether or not the issues are indivisible or so closely related that they should be tried together. Cantu v. Casas, 265 S.W.2d 175 (Ct.Civ.Apps.1953, ref. n. r. e.).

In the instant case the issues concerning damages for personal injuries in regard to which a reversal is required are closely related to the other issues concerning expense necessary to correct defective construction of appellees' home. All of said issues are damage issues for a breach of the contract. The rule is the same in both actions on contract and in tort. 4 Tex.Jur.2d 460. Such issues are indivisible or so closely related that they should not be tried piecemeal. Fisher v. Coastal Transport Co., 149 Tex. 224, 230 S.W.2d 522 (1950); Housing Authority of City of Dallas v. Hubbell, 325 S.W.2d 880 (Ct.Civ.Apps. 1959, ref. n. r. e.); Dallas Railway and Terminal Company v. Hendrix, 261 S.W.2d 610 (Ct.Civ.Apps.1953, no writ history.).

The judgment is reversed and the cause remanded.