Isobel **ROSENBLUM** et vir, Appellants,

v.

Manuel G. **BLOOM**, M.D., Appellee.

No. 5229.

Court of Civil Appeals of Texas,
Waco.

Feb. 28, 1973.

Rehearing Denied March 22, 1973.

**322**

McClure & Burch, D. L. McClure, Kenneth W. Burch, Houston, for appellants.

Martin & Masters, Jack Martin, Houston, for appellee.

OPINION

JAMES, Justice.

This is a medical malpractice suit. The patient, Mrs. Rosenblum and her husband, obtained a jury verdict against Dr. Bloom with damages in the amount of $5000.00, pursuant to which a judgment was entered against the doctor in said amount. The patient and her husband as Plaintiff-Appellants now complain that the $5000.00 damages are inadequate, and that the doctor's attorney made an improper jury argument. We overrule these contentions and affirm the trial court's judgment.

Plaintiff-Appellants Isobel Rosenblum and husband Carl Rosenblum brought this suit against Dr. Manuel G. Bloom, M.D. for damages to the person of Mrs. Rosenblum growing out of medical treatment administered in the office of Dr. Bloom, a dermatologist. Mrs. Rosenblum had been treated by Dr. Bloom in the past for skin blemishes. On November 13, 1969, Mrs. Rosenblum went to Dr. Bloom's office for treatment of four or five skin blemishes on her face called "whiteheads", and also to have Dr. Bloom examine a freckled spot on her chin. She was shown into a treatment room and instructed to lie down on the examination table in preparation for treatment. She was initially waited on by Mrs. Iona Dorothy Wilson, a nurse who had worked for Dr. Bloom only a day and a half. Mrs. Wilson first cleansed off Mrs. Rosenblum's face with Seba-Nil, a rapid-drying cleansing fluid with an alcohol base, using a cotton ball. Then Mrs. Wilson applied to Mrs. Rosenblum's face a 5% solution of trichloroacetic acid (called "TCA") with two cotton swabs. After this first coat of 5% TCA dried, Mrs. Wilson put a second coat of 5% TCA on Mrs. Rosenblum's face and let it dry. In the treatment room were various bottles containing TCA in concentrations of 5%, 10%, 20%, 50% and 100%, as well as Seba-Nil. After the second coat of 5% TCA had dried on Mrs. Rosenblum's face,

Mrs. Wilson took a cotton swab and began to apply 100% TCA to Mrs. Rosenblum's right cheek, whereupon Mrs. Rosenblum complained out loud that "it's burning", and began to get up. Mrs. Wilson left the room for help, and Dr. Bloom came in the room along with Mrs. Akin, a nurse who had worked for Dr. Bloom since 1966. Mrs. Akin put on Mrs. Rosenblum's affected cheek a pack containing baking soda, and Dr. Bloom also worked with her in efforts to relieve the burning.

It is undisputed that 100% TCA is a very strong substance and is damaging to human skin when applied as it was to Mrs. Rosenblum's cheek. The affected area of Mrs. Rosenblum's right cheek scabbed over for a few weeks, after which the scabbing came off and left some scar tissue on her right cheek. Dr. Bloom gave her some ointment which she applied to her face for about two months. After November 13, 1969, Dr. Bloom saw Mrs. Rosenblum every other day until November 24th, then he saw her on December 1st, December 6th, and then in mid-January 1970.

At the time of the incident in question of November 13, 1969, Mrs. Rosenblum was 49 years of age. Her husband, Carl Rosenblum, was in the jewelry business located on the 22nd floor of the First National Life Building in Houston, Texas. He did jewelry designing work and operated a retail jewelry store, employing usually a clerk and a watch repair man. Prior to November 13, 1969, Mrs. Rosenblum assisted her husband in the business as saleslady, typist and bookkeeper. They had four children, two of whom (aged 18 and 15) were living at home with them at the time of the accident in question. They had only one child living in the home with them at the time of trial (June 1972).

Mrs. Rosenblum testified that she was self-conscious and embarrassed, particularily during the time her right cheek was scabbed, and usually wore a scarf on her face to hide or camouflage the affected portion. She further testified that after the scabbing came off, she still was self-conscious and embarrassed because of the scar on her cheek. She claimed that because of the damage to her face, that she had missed a family reunion of her family in Ohio at Thanksgiving 1969, that the social life of her husband and herself had been greatly curtailed, that she refrained from attending P.T.A. meetings and like kinds of activities, and that her husband had to employ a man to work in her place at the jewelry business. However, in her deposition taken in May 1970, (about six months after the incident of November 13, 1969) she admitted that after "two or three months" (after the incident) she was able to resume her normal duties the same as before, except for going back to work. She testified that she did not mind seeing her old friends but she was self-conscious and embarrassed to meet new friends or business customers.

She testified that from November 13, 1969 until January 1972, she had not been engaged in sales work "as much as she had been", that when she worked she stayed mostly in the office; however, since January 1972 she has been working full time. She testified that the scar tissue on her right cheek had "gotten much better" and had become less prominent during the 2½ year period from November 13, 1969 to the time of trial.

In January 1972, Mrs. Rosenblum consulted Dr. Frank Judson Gerow, a plastic surgeon. After his initial conference and examination, Dr. Gerow recommended that Mrs. Rosenblum get a "face lift" operation (the technical name of which is "rhytidoplasty"), to be followed later by chemosurgery, or a "chemical face peel". He testified that the scar on her right cheek was lighter or whiter than the rest of her face; however, in his medical record he made an entry wherein he described Mrs. Rosenblum's scar as "an unobtrusive superficial right facial scar". On cross-examination when he was asked to explain what he meant by this description he testified: "The term unobtrusive means it is not

grossly evident in my interpretation. When I saw her in the office it was not a particularly noticeable scar until I took the time of carefully watching the animation, and whatever variations there might be with animation".

He further testified that when Mrs. Rosenblum came to him, that she asked to be rid of the "tiredness" in her face. He testified that she had bags under her eyes, that she had excess skin on her eyelids, that she had "a nose that was too long for her face, with a dorsal nasal hump and a broad tip", and some bilateral airway obstruction in her nasal passages. He said she had two basic defects in her face, namely, architectural and cosmetic. He recommended that she have a "face lift" operation to correct the architectural defects immediately, and then wait until the fall of 1972 to have chemosurgery or the chemical face peel to correct the cosmetic defects. The chemosurgery consists of putting a chemical on the face, which in Mrs. Rosenblum's case will remove some of the pigment from the skin and at the same time increase the tissue tension of the skin other than the scar tissue, and thereby achieve a "cosmetic blend" or uniformity of color over all of her face. "Chemosurgery" is a controlled second degree burn.

Mrs. Rosenblum accepted Dr. Gerow's recommendations, and was hospitalized from February 10th to February 25, 1972 with the face lift operation. In this operation Dr. Gerow removed the bags from under her eyes, performed the corrective surgery on her nose and eyelids, raised her eyebrows, and stretched the skin generally upward and backward across her face. Dr. Gerow conceded that the work done on the nose and eyelids, and removal of the bags from under her eyes were not necessary for direct repair to the scar. He said he thought this part of the operation would improve the general appearance of her face. Because of the "face-lift" operation Mrs. Rosenblum incurred a $1504.90 hospital bill and a $2100.00 doctor bill to Dr. Gerow, or a total of $3604.90. Dr. Gerow testified that the chemosurgery or "chemical face peel" would necessitate an additional $600.00 doctor bill and a hospital bill of $520.00 to $630.00. This means that both operations would cause to be incurred about $4854.90 in doctor and hospital expenses.

Dr. Bromley S. Freeman, also a plastic surgeon, and under whom Dr. Gerow at one time studied, testified that he examined Mrs. Rosenblum at Dr. Gerow's request at the time she was in the operating room. Dr. Gerow explained to Dr. Freeman the background of the scar and informed him that he was about to do a "face-lift" operation on Mrs. Rosenblum and asked his opinion. Dr. Freeman testified that he suggested to Dr. Gerow to wait, and not do the "face-lift" operation. The substance of Dr. Freeman's testimony is that he believed the "chemical face peel" or chemosurgery would accomplish the best results. Dr. Freeman testified that he was of the opinion that "most of the scars that are caused by chemosurgery or peeling improved over the years." He testified he did not know why Mrs. Rosenblum wanted the "face-life" operation.

Trial was had to a jury, to whom the trial court submitted 28 special issues. Suffice it to say that the jury found the defendant doctor negligent, and that such negligence was a proximate cause of Plaintiffs' damages. There were two special issues inquiring as to actual damages, being Numbers 26 and 27. Number 26 restricted the jury's consideration to past and future pain and anguish, past lost earnings, future lost earning capacity, and past and future medical and hospital care, to which issue the jury answered $5000.00.

Special Issue Number 27 restricted the jury's consideration to Mrs. Rosenblum's past and future "disfigurement", and past and future "physical impairment," to which issue the jury answered zero.

Pursuant to the jury verdict the trial court entered judgment in favor of Mr. and Mrs. Rosenblum against Dr. Bloom in the amount of $5000.00 and costs. The Rosenblums filed a motion for new trial, which was overruled by the trial court, from which action the Rosenblums appeal.

Plaintiff-Appellants assert five points of error, to the effect that (1.) the trial court should have granted a new trial because of the failure of the jury to find any damages for past and future disfigurement and physical impairment of Mrs. Rosenblum, and (2.) that the finding of "zero" to Issue No. 27 is so against the great weight and preponderance of the evidence as to be clearly wrong; (3.) that the jury was biased and prejudiced against Plaintiffs as shown by the finding of $5000.00 to Issue No. 26, and (4.) that such finding to No. 26 was so against the great weight and preponderance of the evidence as to be clearly wrong; and (5.) that the Defendant's attorney made an improper jury argument, which will be discussed hereafter in this opinion.

We overrule all of Plaintiff-Appellants' points and now proceed to discuss Points 1 through 4 together. Rule 328, Texas Rules of Civil Procedure, among other things, provides: "New trials may be granted when the damages are manifestly too small or too large, * * *"

■■■ We have carefully studied the entire record, and conclude that the jury was not biased and prejudiced against Plaintiffs, and that the amount of damages assessed by the jury are not "manifestly too small" or so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. The jury heard the testimony of the Plaintiffs, and of the medical witnesses, observed their demeanor and conduct on the witness stand, and having carefully weighed the testimony, returned their findings into court. The credibility of witnesses, and the weight to be given their testimony are questions for the jury. This is especially true with respect to testimony of parties or other persons interested in the litigation. Matters of pain and suffering, future pain and suffering, future disfigurement and future physical impairment are necessarily speculative, and it was peculiarly within the province of the jury to resolve these matters, and set the amount of such damages. Harbuck v. Ramos (Waco, Tex.Civ. App. C.A.1963) 371 S.W.2d 912, no writ: Dickerson v. Bluebonnet Express (Waco, Tex.Civ.App. C.A.1967) 410 S.W.2d 861, error refused NRE; Armstead v. Harvey (Texarkana, Tex.Civ.App. C.A.1965) 390 S.W.2d 871, no writ; Arrington v. Paschall (Dallas, Tex.Civ.App. C.A.1961) 352 S.W. 2d 866, error refused NRE; Ward v. Larrimore (Beaumont, Tex.Civ.App. C.A.1956) 290 S.W.2d 764, error refused NRE.

■■■ The measure of damages in a personal injury case cannot be measured by a mathematical yardstick. Each case must be measured by its own facts, and considerable discretion and latitude must necessarily be vested in a jury. Houser v. Sunshine Laundries and Dry Cleaning Corporation (San Antonio, Tex.Civ.App. C.A. 1969) 438 S.W.2d 117, error refused NRE. An appellate court will reverse the judgment of the trial court only if the award falls below a rational appraisal or estimate. Walker v. Missouri Pacific Railroad Co. (Houston, Tex.Civ.App. 14th C.A.1968) 425 S.W.2d 462, error refused NRE: 17 Tex.Jur.2nd., "Damages" par. 353, p. 481.

■■■ In the case at bar, the actual medical expense of the "face-lift" operation was $3604.90 and the contemplated chemosurgery expense would amount to about $1250.00, causing Mrs. Rosenblum's total medical expense, both past and future, to amount to approximately $4854.90. By the award of $5000.00 in answer to Special Issue No. 26, it logically appears that the jury believed that compensating Mrs. Rosenblum for her actual and contemplated future medical expense would be adequate.

Dr. Freeman's opinion as expressed in his testimony might well lead the jury to believe that the "face-lift" operation was unnecessary and that the "chemical face peel" (a much less expensive operation) was all she needed. From the four corners of the record, the jury may have concluded that Plaintiffs exaggerated their damages, and sought surgical repairs to Mrs. Rosenblum's face of an architectural nature which were not necessary to repair damage caused by the Defendant doctor. In short, the jury's action on both damage issues was justified by the evidence and inferences deducible therefrom.

■ Moreover, excepting medical expenses, the only compensable damages to which Plaintiffs are entitled under the record as a result of disfigurement and physical impairment are mental anguish and lost earnings. The jury compensated Plaintiffs for those damages, past and future, in its answer to Issue No. 26. Therefore, we cannot say that the jury's answer to Issue No. 27 of "zero" is "manifestly too small" or so against the great weight and preponderance of the evidence as to be manifestly unjust. See Southwestern Bell Telephone Co. v. Ferris (Tex.Civ.App., 1935, writ dism.) 89 S.W.2d 229, 233–234; cited with express approval in Houston Transit Co. v. Felder, 146 Tex. 428, 208 S. W.2d 880, 883 (1948).

Plaintiff-Appellants by their fifth point complain of the following jury argument made by Defendant-Appellee's counsel:

"Ladies and gentlemen, we have worked all of our lives. Just how many of us can right this minute walk out of that jury box and give me a check for $500.00 and let me go here and cash it right now, after working all of our lives? How many of us can walk out of here and give me a check for one thousand dollars cash and let me go to your bank and get that money?"

Plaintiff-Appellants' attorney approached the bench and made an objection, whereupon the trial court retired the jury. During the conference before the court outside the presence and hearing of the jury, Plaintiffs' attorney told the court he was entitled to have the jury instructed not to consider this argument for any purpose, or alternatively, that the jury be instructed that the Defendant will not have to pay this judgment.

The Defendant's attorney told the court that by this argument he was merely trying to show the jury the importance of money, particularly since the Plaintiff was claiming large sums of money.

The trial court at first requested the Defendant's attorney that when he resumed his argument, to make a statement "to get away from the inference that the doctor has to pay this out of his own pocket." Defendant's attorney agreed to make a statement to the jury to the effect that he "asked you these questions to show you that $100,000.00 is a lot of money." The trial court indicated his approval of such a statement, and then Plaintiffs' attorney spoke up and told the court: "To permit him to cure his own error is going to do nothing but drive it home."

Whereupon the trial court said: "In the context of that which has been discussed, I feel greater error would be caused by my emphasizing it by giving any instruction at this time", and overruled Plaintiffs' objection. Upon Defendant's counsel's resumption of the argument, nothing further along the lines of the above-quoted argument was said.

■ Our Supreme Court has enunciated the test pertaining to jury arguments in Texas Sand Co. v. Shield (Tex.Sup.Ct. 1964) 381 S.W.2d 48:

" * * * before reversing a judgment because of the argument, it must appear

not only that the argument was improper, but that it was such as to satisfy an appellate court after a review of all of the evidence that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. Rules 434 and 503, Texas Rules of Civil Procedure; Aultman v. Dallas Railway and Terminal Co., 152 Tex. 509, 260 S.W. 2d 596 (1953). Unless the argument of plaintiffs' counsel was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in the case, this court will not disturb the judgments of the courts below even though the argument complained of was improper and uninvited. The question of whether the argument was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment, is to be determined as a matter of our judgment in the light of the record as a whole. See Southwestern Greyhound Lines v. Dickson, 149 Tex. 599, 236 S.W.2d 115 (1951); Texas Power & Light Co. v. Hering, 148 Tex. 350, 224 S.W.2d 191 (1949)".

Applying the above rules to the case at bar, it is the duty of this court to determine whether or not the above-quoted statements in the jury argument led to the rendition of an improper verdict, by reviewing the record as a whole. Even if it be conceded that the argument was error, we do not conclude that it amounted to such a denial of the right of appellant as "was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case". Rule 434, TRCP; Stott v. Houston Lighting and Power Co. (Houston, Tex.Civ.App. 14th C.A.1970) 453 S.W.2d 364, no writ. Also see 4 Tex.Jur.2d., "Appeal and Error—Civil", par. 946, pp. 588 et seq.

All of Appellant's points are overruled. Judgment of the trial court is affirmed.

Affirmed.