**AMOCO PRODUCTION COMPANY, INC., et al., Appellants,**

v.

**Terry THOMPSON and Ideal Lease Service, Inc., Appellees.**

**No. 13–82–016–CV.**

Court of Appeals of Texas, Corpus Christi.

May 26, 1983.

Opinion on Motion for Rehearing May 26, 1983.

Second Motion for Rehearing Denied June 23, 1983.

James B. Galbraith, McLeod, Alexander, Powel & Apffel, Galveston, for appellants.

Ernest H. Cannon, Robert C. Floyd, Butler, Binion, Rice, Cook & Knapp, Houston, for appellees.

Before BISSETT, YOUNG and KENNEDY, JJ.

## OPINION ON MOTION FOR REHEARING

BISSETT, Justice.

On Motion for Rehearing, we withdraw our opinion of April 7, 1983, and issue this one therefor.

This is a suit initiated by appellee Terry Thompson ("Thompson") against appellant Amoco Production Company, Inc. ("Amoco") and appellee Ideal Lease Service, Inc. ("Ideal") to recover for injuries sustained by him while working as a welder at facilities operated by Amoco. In response to special issues, the jury found acts of Amoco to be both negligence and proximate causes of Thompson's injuries. Thompson was found to be free of all fault, and the entire cause of the injury was laid at the door of Amoco. These findings are not questioned. For reasons hereinafter enumerated, we affirm in part and reverse and remand in part.

The incident made the basis of the suit occurred on December 29, 1980, in Bay City, Texas, when Thompson struck his welding torch and gas vapors that had accumulated in the area flashed, burning him. Thompson was an independent, self-employed welder whose services for Amoco on that day had been arranged by Ideal. Amoco filed its cross-action against Ideal, seeking contractual indemnity in the event of a recovery of damages by Thompson. The special issues submitted on the cross-action were answered favorably to Ideal, and no relief was allowed on the indemnity claim.

In its first point of error, Amoco contends that the trial court erred in denying its motion for continuance. Numerous factual averments are made in that motion. It is notarized and states that the attorney for Amoco "... on his oath states that he has read the above Motion for Continuance ... *and based on his information and belief,* the allegations and statements contained therein are true and correct." (Emphasis supplied.)

Rule 251, Tex.R.Civ.P.Ann. (Vernon 1976), provides:

"[N]or shall any continuance be granted except for sufficient cause supported by affidavit...."

The applicable standard for reviewing the trial court's denial of a motion for continuance is abuse of discretion. *Zamora v. Romero,* 581 S.W.2d 742, 745 (Tex.Civ.App. —Corpus Christi 1979, writ ref'd n.r.e.). A statement made by an attorney on "information and belief" does not meet the requirement of Rule 251 that the motion for continuance be supported by *affidavit. Bray v. Miller,* 397 S.W.2d 103, 106 (Tex. Civ.App.—Dallas 1965, no writ). See *Nutter v. Abate Cotton Harvesting Co.,* 430 S.W.2d 366, 368 (Tex.Civ.App.—El Paso 1968, writ ref'd n.r.e.). Where the requirement of the rule that motions be supported by affidavit is not met, we must presume that the trial court did not abuse its discretion. *Zamora v. Romero,* supra, 581 S.W.2d at 746. Amoco's first point of error is overruled.

In Amoco's second point of error, complaint is made concerning the trial court's "permitting" Thompson to file an amended original petition on the morning of trial. The amending of pleadings is governed by Rule 63 of our Rules of Civil Procedure, wherein it reads:

"Parties may amend their pleadings ... provided, that any amendment offered for filing within seven days of the date of trial or thereafter ... shall be filed only after leave of the judge is obtained, which leave *shall* be granted by the judge unless there is a showing that such amendment will operate as a surprise to

the opposite party." (Vernon 1979) (emphasis supplied).

It should be noted here, as was done in *Jones v. Houston Materials Co.*, 477 S.W.2d 694 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ), that it does not affirmatively appear from the record that leave of the trial court was obtained, although such filing is apparent in the record and the recorded instrument is contained in the transcript before this Court. Similarly, the record reveals no objection by Amoco to the filing of an amended pleading, and no motion to strike. Id.

■■■ The trial court has wide discretion in allowing the filing of amended pleadings, subject to review upon a showing of an abuse of that discretion. *Alcazar v. Southwestern Bell Telephone Co.*, 353 S.W.2d 933, 935 (Tex.Civ.App.—Austin 1962, no writ). There is no abuse of discretion absent a claim of surprise. Id. No such claim is indicated by the record before us. Amoco's second point of error is overruled.

In points of error three through eighteen, Amoco complains of various acts of the trial court and findings of the jury relating to its cross-action against Ideal for indemnity. That claim is predicated upon paragraph ten of the Well and Lease Service Master Contract entered into between Amoco and Ideal, wherein it reads:

"10. In order to eliminate controversies between Contractor [Ideal], its Subcontractors and Amoco and its joint owners, if any, and their respective insurers, Contractor assumes all liability for and hereby agrees to defend, indemnify and hold Amoco, its joint owner or owners, if any, and their insurers, harmless from and against any and all losses, costs, expenses and causes of action, including attorney's fees and court costs, for injuries to and death of Contractors and its Subcontractor's Employees, arising out of, incident to, or in connection with any and all operations under this contract and whether or not such losses, costs, expenses and causes of action are occasioned by or incident to or the result of the negligence of Amoco, its joint owner or owners, if any,

and its agents, representatives and employees. Contractor agrees to insure this assumption of liability. The liability assumed by Contractor pursuant to this clause shall be limited to the amount carried by Contractor's current liability insurance...."

Regarding Amoco's claim for indemnity, the special issues were submitted, over Amoco's objections, and answered thusly:

### SPECIAL ISSUE NO. 14

Do you find from a preponderance of the evidence that at the time of the accident Terry Thompson was acting as a sub-contractor for Ideal Lease Service or as an independent contractor for Amoco?

A "subcontractor" means a person who has agreed to perform work under an existing contract. A subcontractor may be an independent contractor.

An "independent contractor" means a person who, in the pursuit of an independent business, works for another person using his own methods without submitting himself to the control of others with respect to the details of his work, and represents the will of such other person only as to the results of his work and not as to the means by which it is accomplished.

Answer "subcontractor" or "independent contractor" or "neither."

Answer: Independent contractor

### SPECIAL ISSUE NO. 15

Do you find from a preponderance of the evidence that at the time of the accident Ideal Lease Service was performing work pursuant to the terms and conditions of the written contract?

\* \* \* \* \* \*

Answer "We do" or "We do not."

Answer: We do not

■■■ In order for an indemnity agreement to protect an indemnitee from the consequences of its own negligence, the obligation of the indemnitor to do so need not be stated in so many words, but must be

expressed in clear and unequivocal terms. *Firemen's Fund Insurance Co. v. Commercial Standard Insurance Co.,* 490 S.W.2d 818, 822 (Tex.1973); *Sira & Payne, Inc. v. Wallace & Riddle,* 484 S.W.2d 559, 561 (Tex. 1972); *Joe Adams & Son v. McCann Construction Co.,* 475 S.W.2d 721, 723 (Tex. 1972). The "clear and unequivocal" requirements are satisfied by the indemnity clause presently before us.

Points of error seven through ten complain of the trial court's refusal to submit two issues requested by Amoco, and of the submission of special issues fourteen and fifteen in their stead. We are of the opinion that these points are meritorious and necessitate a new trial.

The refused issues read:

"Do you find from a preponderance of the evidence that on the occasion in question Terry Thompson was a Subcontractor of Ideal Lease Service, Inc.?

Answer 'We do' or 'We do not.'

Do you find from a preponderance of the evidence that the occurrence in question arose out of or was incident to or in connection with any operation under the contract between Amoco Production Company and Ideal Lease Service, Inc.?

Answer 'We do' or 'We do not.'"

■ Each party to litigation is entitled to have controlling issues submitted which are supported by the evidence and are essential to its theory of the case and which properly present fact issues raised by the pleadings. *Union Carbide Corp. v. Burton,* 618 S.W.2d 410, 415 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). A "controlling issue" is one essential to the right of action. *Fidelity & Casualty Co. of New York v. Jefferies,* 545 S.W.2d 881, 885 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.). Stated another way, a "controlling issue" is a question which inquires as to the truth of a proposition of fact which constitutes a component element of a ground of recovery or of defense, and which, when answered, would have an effect upon the judgment. *Atchison, Topeka & Santa Fe Ry. Co. v. Mahon,* 473 S.W.2d 598, 609 (Tex.Civ.App.—Amarillo 1971, writ ref'd n.r.e.).

There was considerable testimony elicited at trial concerning the Well and Lease Service Master Contract upon which Amoco's claim is based and the course of dealings between Amoco and Ideal pursuant thereto. This evidence conclusively established that no representatives of Ideal were at the site of the accident at the time of the occurrence, and that Ideal was playing no role in the work being done, other than supplying a welder, Thompson, at Amoco's request. It was not actively involved in conducting servicing operations at the accident site.

■ In submitting special issues, the trial court is given discretion and is not required to track the exact language of the pleadings. *Braugh v. Phillips,* 557 S.W.2d 155, 158 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.); *Green v. Walgreen Drug Co. of Texas,* 368 S.W.2d 688, 690 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.). In the instant case, Amoco's pleadings and requested issue concerning the effect of the contract followed the language of the contract, to-wit: "... all ... causes of action ... arising out of, incident to, or in connection with any and all operations under this contract ...."

■ In determining whether a special issue as submitted gives rise to prejudicial error, consideration must be given to the probable effect had on the minds of the jurors. *Pan-Am Foods, Inc. v. Perez,* 386 S.W.2d 316, 320 (Tex.Civ.App.—Corpus Christi 1965, writ ref'd n.r.e.). Special issue number fifteen can be all too easily construed to inquire whether Ideal was actively involved in performing and conducting service operations at the time of the accident. The issue as requested by Amoco was the controlling issue of its cause of action, not whether Ideal was "performing work" at the time of the accident. The improper submission of an issue constitutes reversible error when it has confused or misled the jury and harm is suffered by the complaining party. *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 749–50 (Tex.1980). We sustain Amoco's points of error numbers eight and ten.

Similarly, special issue number fourteen, inquiring as to the status of Thompson, tended to mislead the jury. It was not contested (in fact, it was admitted) throughout the trial that Thompson was an independent contractor. Thus, when the alternatives "subcontractor for Ideal" or "independent contractor for Amoco" were put in front of the jury, the choice was clear. The issue instructed the jury that a subcontractor may be an independent contractor, but did not leave the jury the option of determining that Thompson was both: he had to be one or the other, or neither. The controlling issue was Thompson's relation to Ideal, not to Amoco, and it was that position alone about which inquiry should have been made. Points seven and nine are sustained.

In points of error nineteen through thirty-two, Amoco challenges the legal and factual sufficiency of the evidence to support the jury's findings regarding Thompson's damages. In point number thirty-three, error is alleged in the trial court's failure to order remittitur for any amount in excess of $30,000.00. The jury's responses to special issue number sixteen inquiring as to damages are as follows:

A. Physical pain and mental anguish in the past: $20,000.00

B. Physical pain and mental anguish, which in reasonable probability, he will suffer in the future: $85,000.00

C. Loss of earnings in the past: $20,-000.00

D. Loss of earning capacity, which in reasonable probability, he will sustain in the future: $200,000.00

E. Physical impairment in the past: $6,500.00

F. Physical impairment which, in reasonable probability, he will suffer in the future: $85,000.00

G. Cosmetic disfigurement in the past: $6,500.00

H. Cosmetic disfigurement which, in reasonable probability, he will suffer in the future: $65,000.00

I. Medical expenses in the past: $4,493.00

The damages found by the jury aggregate $492,493.00. Judgment was rendered on the verdict. Later, as a condition for overruling Amoco's motion for new trial, the trial court ordered a remittitur in the amount of $30,000.00, but gave no indication of the basis therefor, i.e., which category or categories of damages it felt to be excessive. Thereafter, Thompson released to Amoco $30,000.00 "of such final judgment."

The evidence anent points numbers 21, 22, 27, 28, 29, 30, 31 and 32, which challenges the findings in items B, F, G and H above, respectively, will be discussed first.[1] The accident occurred on December 29, 1980. Thompson was hospitalized immediately and remained so for sixteen days. Dr. James E. Cowart, his treating physician, testified that he had "significant" burns on his face, arms and hands. By way of explanation, Dr. Cowart stated that many of these were deep second-degree burns, but not quite third-degree. It was necessary for Dr. Cowart to "debride," or remove the dead skin from, Thompson's hands. The debridement of the hands was complete.

Both Thompson and Dr. Cowart testified that he (Thompson) was in severe pain. Dr. Cowart explained that second-degree burns will be more painful than more serious third-degree burns since the latter entail the burning of the nerve endings as well, serving to deaden the area. On a pain scale of ten, Dr. Cowart said that he would rate Thompson's burns as an eight or nine.

Thompson's pain was treated primarily with Demerol, a narcotic, to which he developed an addiction. Such is a risk which must be run when treatment necessitates the use of narcotics, which are addictive by nature, and different patients have varying tolerances to them. It so happens that

---

1. Points of error numbers 19 and 20 allege error in the submission of special issue sixteen as a whole. Our treatment of the various subsections of that issue will be dispositive of these points as well.

Thompson has quite a low tolerance, resulting in addiction in a relatively short period of time. Such a propensity on his part is neither voluntary nor controllable. The drug addiction gave rise to serious, adverse physical and psychological effects, including family discord. Once Thompson had withdrawn from the painkiller, he had to have a tooth pulled, and the medication prescribed by his dentist initiated the process all over again. He will be especially prone in the future if ever it becomes necessary again to resort to any such medication. Dr. Cowart frankly described narcotic addiction as "a nightmare."

As regards cosmetic disfigurement, photographic evidence in the record showed Thompson while hospitalized with much of the skin burned away from his face. Even though his recovery has been excellent, Thompson suffers from increased skin pigmentation. It is necessary for him to wear long-sleeved shirts while working during warm weather since his sensitivity to heat has been increased.

Dr. Cowart testified that he had tested Thompson in his office, and the results indicated that his ability to move his hands and fingers and to grasp and pick up items is normal. Theoretically, he should suffer from no real disabilities. Thompson, however, complained of increased sensitivity to heat and cold in his hands, and the loss of ability to grasp items and hold them steady for prolonged periods. Dr. Cowart attributed this to scarred tissue, tendons and joints which were affected by the burns, and increased skin pigmentation. He stated that, while Thompson may have tested normally in office environment, no two individuals will react in precisely the same manner to the same injuries, and that there is no reason not to believe Thompson's complaints, which are perfectly compatible with the clinical course followed by patients who have suffered deep second-degree burns.

The measure of damages in a personal injury case is not subject to precise mathematical calculation. *Rosenblum v. Bloom,* 492 S.W.2d 321, 325 (Tex.Civ.App.— Waco 1973, writ ref'd n.r.e.); *Houser v. Sunshine Laundries & Dry Cleaning Corp.,* 438 S.W.2d 117, 120 (Tex.Civ.App.—San Antonio 1969, writ ref'd n.r.e.). Matters of past and future pain and suffering, disfigurement and physical impairment are necessarily speculative, and it is particularly within the province of the jury to resolve these matters and determine the amounts attributable thereto. *Rosenblum v. Bloom,* supra. Each case must be measured by its own facts, and considerable latitude must necessarily be vested in the jury. Id.; *Houser v. Sunshine Laundries & Dry Cleaning Corp.,* supra. Points of error numbers 21, 22, and 27 through 32 are overruled.

The findings of the jury concerning Thompson's loss of past earnings and impairment of future earning capacity must be viewed in a somewhat different light.

"In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury. However, the verdict must be based on something more than mere conjecture. It must be an intelligent judgment, based upon such facts as are available. Even where the injury is of such a serious and permanent nature that loss of earning capacity is the necessary result, proof is required to show the extent and amount of damages. [Citation omitted.] No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible. [Citations omitted.] Under this rule, the required certainty of proof will necessarily vary." *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943); *Pride Transport Co., Inc. v. Hughes,* 591 S.W.2d 631, 633 (Tex.Civ.App.—Eastland 1979, writ ref'd n.r.e.).

Given Dr. Cowart's testimony concerning the speed and progress of Thompson's recovery, the fact that his wounds had all healed by February 10, 1981, and the doctor's opinion that he would continue to improve with time, we are not of the opinion that the injuries are of such a

serious nature that loss of earning capacity is the necessary result. On the other hand, given Thompson's testimony and the opinion voiced by Dr. Cowart that he had no question but that Thompson is now limited in his ability and skill as a welder, we have no doubt that his future earning capacity has been impaired. This does not, however, relieve Thompson of the burden of proving the extent of that impairment as precisely and with as much exactness as is possible under the circumstances. Where, as here, plaintiff's earning capacity is not totally destroyed, but only impaired, the extent of his loss can best be shown by comparing his actual earning before and after his injury. *McIver v. Gloria,* supra; *Greyhound Lines, Inc. v. Craig,* 430 S.W.2d 573, 575 (Tex.Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). But specific proof of actual earnings and income are evidentiary of the ultimate issue, and the true measure of damages is the diminished earning power or earning capacity of the plaintiff, in the past or in the future, *directly resulting from the injuries he sustained in the accident. Southwestern Bell Telephone Co. v. Sims,* 615 S.W.2d 858, 864 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ); *Greyhound Lines, Inc. v. Craig,* supra.

Thompson was 24 years old at the time of trial, and had been working as a welder since he was 17. He had worked for a number of years for Coastal Welding, a company run by his uncle. He worked for Coastal Welding for the first eleven months of 1980, earning approximately $300.00 per week. In November, 1980, he started his own concern, Blue Streak Welding, billing out his time at $20–$25 per hour. He testified that Blue Streak billed out $1,800.00 for two weeks in November, 1980, and $4,800.00 for the month of December, for a total of $6,600.00. His wife, who kept his books for him, placed the December figure at approximately $5,000.00, but did not testify regarding the receipts for November.

Thompson stated that he earned approximately $13,000.00 during the eleven months he spent working for Coastal Welding in 1980. Of the money billed out by Blue Streak, $3,046.62 was net profit and includ-ed on his 1980 federal income tax return when computing total income. His wife earned $4,133.76 during the year 1980. Their joint total income for the year in which the accident occurred, as reported on their income tax return, was $18,518.05, of which $14,384.29 was attributable to Thompson. The 1980 tax return was the only evidence introduced regarding his earnings prior to the accident.

The case came to trial in September, 1981, nine months after the accident, and seven months after Thompson had returned to work. During that seven-month period, he did work for five separate welding concerns, including Coastal Welding. The work for at least two of these was done on a full-time basis for periods of three days to one and one-half weeks, until the jobs called for were completed. He returned to work for Coastal Welding on a full-time basis from April through August. He found that he was not able to weld as much as he had been, and was given the position of shop foreman. He was laid off by Coastal because there was not a sufficient amount of work to do. At the beginning of September, 1981, three weeks before commencement of trial, he started up Blue Streak Welding again, was holding himself out as a welder, and taking on and completing jobs.

There was evidence that there are numerous independent welders in the Bay City area and that the competition for the available work is keen. Thompson had only had his own business in operation for a month and one-half prior to the accident. Additionally, he was laid off from Coastal due to lack of work, which cannot be attributed directly to his injuries.

█ There was no evidence offered of the amount of money he earned in the period during 1981 while he was back at work, be it for Coastal Welding or any of the other welding concerns, or with Blue Streak. Thus, there was no basis for the jury to determine that in the nine months between the time of the accident and that of trial, during seven of which he was capable of and actively engaged in working, his

*lost* earnings exceeded his *entire* earnings of the previous year by approximately 39%.

 Nor was there any evidence regarding Thompson's life expectancy. See *Southwestern Bell Telephone Co. v. Sims,* supra, 615 S.W.2d at 865; *Wharf Cat, Inc. v. Cole,* 567 S.W.2d 228, 233 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). The figure for future impairment of earning capacity, then, represents an unknown difference between loss of earnings subsequent to the accident and earnings prior to the accident extrapolated over an unknown period of time into the future. These two items of damages cannot have been based upon anything but conjecture and cannot stand. Amoco's points of error numbers 24 and 26, in which the factual sufficiency of the evidence to support the findings concerning past and future lost earnings is challenged, are sustained.

In its thirty-third point, Amoco charges error on the part of the trial court in failing to order a remittitur for any amount in excess of $30,000.00, while in his cross-point, Thompson alleges that the trial court erred in ordering any remittitur at all. In determining whether an award of damages is so excessive as to require a remittitur:

"All the Court of Civil Appeals can do, and all that is required of it to do ... is to exercise its sound judicial judgment and discretion in the ascertainment of what amount would be reasonable compensation for the injuries sustained, and treat the balance as excess .... [Having] decided upon an amount that would be reasonable compensation ... it should authorize a remittitur of the excess ... in accordance with its sound judgment." *Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 840 (1959); *Wilson v. Freeman,* 108 Tex. 121, 185 S.W. 993, 994 (1916).

 In determining whether a remittitur should have been granted, the trial court was governed by the same standard as is this Court on appeal. *Flanigan v. Carswell,* supra; *Atchison, Topeka & Santa Fe Ry. Co. v. Mahon,* 473 S.W.2d 598, 613 (Tex.Civ.App.—Amarillo 1971, writ ref'd

n.r.e.). We have already discussed the evidence in support of the findings, and find no error in the trial court's action concerning the remittitur.

Part of Amoco's argument in support of point of error number 33 is based upon the award for lost earnings, past and future. We are of the opinion that our holding concerning Amoco's points numbers 24 and 26 requires a reversal of the cause and a new trial as to those two issues, rather than a remittitur. If the evidence adduced at trial did not provide the jury with a sound basis for making an intelligent decision, we can do no better with that same evidence. We will not attempt to remedy the conjecture of the jury with more of our own. Similarly, we assume that the trial court did not attempt to do so in ordering a remittitur. For this reason, the $30,000.00 remittitur ordered must be applied against the remaining items of damages.

Rule 434, Tex.R.Civ.P., provides:

"[I]f it appears to the court that the error affects a part only of the matter in controversy and that such part is clearly separable without unfairness to the parties, the judgment shall only be reversed and a new trial ordered as to that part affected by such error, provided that a separate trial on unliquidated damages alone shall not be ordered if liability issues are contested."

As noted earlier, appellant does not challenge the findings regarding negligence or proximate cause.

 A judgment awarding damages for injuries may be affirmed as to some of those losses and reversed for new trial on others so long as the issues are separable and no unfairness will be caused to the parties. *Community Properties, Inc. v. Neely,* 611 S.W.2d 947, 952 (Tex.Civ.App.—Tyler 1981), rev'd on other grounds 639 S.W.2d 452 (Tex.1982); *Garrison v. Texas Commerce Bank,* 560 S.W.2d 451, 455 (Tex. Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.). The test as to severability is whether or not the issues are indivisible or so clearly related that they should be tried

together. *Blume v. Weaver*, 412 S.W.2d 760, 764 (Tex.Civ.App.—Eastland 1967, no writ); *Cantu v. Casas*, 265 S.W.2d 175, 177 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.). Stated another way, the judgment may be reversed in part and affirmed in part where the valid portion is not so dependent upon the invalid as to fall with it. *Garrison v. Texas Commerce Bank,* supra.

Those points of error which have not hereinbefore been expressly overruled or sustained are hereby overruled.

We sever the issues relating to loss of past earnings and loss of future earning capacity from the other issues in the case. That portion of the judgment amounting to $242,493.00 ($272,493.00 less the remittitur of $30,000.00) awarded Terry Thompson in his action against Amoco Production Company, Inc., as damages for past and future physical pain and mental anguish, for past and future physical impairment, for cosmetic disfigurement and for past medical expenses is affirmed. That portion of the judgment which decrees that Terry Thompson take nothing in his action against Ideal Lease Service, Inc., is affirmed. That portion which decrees that Amoco Production Company, Inc., in its cross-action take nothing against Ideal Lease Service, Inc., is reversed and remanded to the trial court.

Those portions of the judgment which decree that Terry Thompson recover from Amoco Production Company, Inc., the sum of $20,000.00 for loss of earnings in the past and the sum of $200,000.00 for loss of earning capacity in the future are reversed, and those issues are remanded to the trial court for a new trial.

Costs of this appeal are taxed fifty percent (50%) to Terry Thompson and fifty percent (50%) to Amoco Production Company, Incorporated.