Affirmed and Memorandum Opinion filed August 9, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00825-CV

___________________

 

Glenn Belford, Appellant

 

V.

 

Michael T. Walsh, Appellee



 



 

On
Appeal from the 125th District Court

Harris County,
Texas



Trial Court Cause No. 2007-03487

 



 

 

MEMORANDUM OPINION

            Glenn Belford appeals
from a judgment in which the trial court awarded him certain categories of
damages in his personal-injury suit against appellee, Michael T. Walsh.  In two
issues, Belford contends the evidence is factually insufficient to support the
jury’s findings that he did not sustain several additional categories of
damages.  We affirm.

I.  Factual and Procedural
History

            On
October 13, 2005, Belford and Walsh were in an auto accident when Walsh struck
Belford’s vehicle from behind, propelling it into the vehicle ahead.  Belford
got out of his car and helped to separate the vehicles.  He had no visible
injuries.  Paramedics arrived at the scene, immobilized Belford’s neck, and
transported him to an emergency room where he was evaluated and released.  However,
he subsequently had extensive medical treatment, including two spinal
surgeries.  

            Belford sued Walsh for injuries sustained
in the auto accident.  The jury found that both parties were negligent and assigned
7% liability to Belford and 93% to Walsh.  Belford was awarded compensation for
past physical pain and mental anguish, past loss of earning capacity, past
physical impairment, and past and future medical expenses, but the jury found
that Belford was entitled to no compensation for past disfigurement or for
future physical impairment, future disfigurement, or future physical pain and
mental anguish.  On June 9, 2009, the trial court signed a final judgment
awarding Belford $137,600.98 in damages (consistent with the verdict except for
past medical expenses which were reduced by stipulation of the parties), plus
pre-and post-judgment interest and costs of court.  Belford filed a motion for
new trial in which he challenged the factual sufficiency of the evidence, which
the court denied.

II.  Issues Presented

            In his first appellate issue, Belford challenges
the factual sufficiency of the evidence supporting the jury’s finding of zero
damages for past disfigurement, future disfigurement, future physical
impairment, and future physical pain and mental anguish.  In his second issue,
Belford argues the trial court abused its discretion by denying his motion for
new trial.  This complaint is encompassed within the first issue because the
basis for Belford’s motion for new trial was his factual-insufficiency
contention.

III.  Standard of Review

Disfigurement, physical
impairment, and physical pain and mental anguish are overlapping categories of
damages.  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 770
(Tex. 2003).  When the appellant challenges the jury’s failure to find greater
damages in more than one overlapping category, we first determine if the
evidence unique to each category is factually sufficient.  Id. at 775.  If
it is not, we consider all the overlapping evidence, together with the evidence
unique to each category, to determine if the total amount awarded in the
overlapping categories is factually sufficient.  Id.  We will reverse
for factual insufficiency only if we conclude, after examining the evidence in
a neutral light, that the verdict is so against the great weight and
preponderance of the evidence as to be manifestly unjust, shock the conscience,
or clearly demonstrate bias.  Id. at 761.  

IV.  The Jury Charge

            We begin by examining the jury charge to
identify the evidence that will be pertinent to our analysis.  See id. at
762.  The trial court instructed the jury as follows:

            What sum of money, if
paid now in cash, would fairly and reasonably compensate Glenn Belford for his
injuries, if any, that resulted from the occurrence in question?

            Do not include any
amount for any condition existing before the occurrence in question, except to
the extent, if any, that such other condition was aggravated by any injuries
that resulted from the occurrence in question.

            Consider the elements of
damages listed below and none other.  Consider each element separately.  Do not
include damages for one element in any other element.  Do not include interest
on any amount of damages you find.

            Do not reduce the
amounts, if any, in your answers because of the negligence, if any, of Glenn
Belford.

            Answer separately, in
dollars and cents, for damages, if any.

            a.         Physical pain
and mental anguish sustained in the past.

                        Answer:         $20,000

b.         Physical
pain and mental anguish that, in reasonable probability, Glenn Belford will
sustain in the future.

            Answer:         $
-0- 

c.         Loss
of earning capacity sustained in the past.

            Answer:         $38,000

d.         Disfigurement
sustained in the past.

            Answer:         $
-0- 

e.         Disfigurement
that, in reasonable probability, Glenn Belford will sustain in the future.

            Answer:         $
-0- 

f.          Physical
impairment sustained in the past.

Answer:         $15,000

g.         Physical
impairment that, in reasonable probability, Glenn Belford will sustain in the
future.

            Answer:         $
-0- 

h.         Reasonable
expenses of necessary medical care in the past.

            [This was followed by a
list of 17 of Belford’s health-care providers.  Each provider’s name
corresponded to a blank for the jury’s answer, and the jury made a separate
finding for each.  The jury found that all of the expenses for the care Belford
received from eight providers was reasonable and necessary.  Only half of the
expenses from six providers were found to be compensable, and the jury found
that none of the expenses for the care from two providers was reasonable and
necessary.][1]

i.          Reasonable
expenses of necessary medical care that, in reasonable probability, Glenn
Belford will incur in the future.

            Answer:         $45,000[2]

The jury charge contains no definition of the terms
used in the damage categories “physical pain and mental anguish,”
“disfigurement,” and “physical impairment.”  We therefore summarize the
evidence in the record concerning the disfigurement, physical impairment,
physical pain, and mental anguish Belford experienced, both before and after
the accident. 

V.  The
Evidence

A.        Pre-Accident Medical Evidence 

When the accident occurred
in 2005, Belford was 47 years old, and according to medical records, he began
having back pain when he was 20 years old.  In the intervening years, he was
treated by a chiropractor two or three times annually, and he occasionally
sought treatment from other physicians.[3] 
In 1994, when he was 36 years old, Belford was diagnosed with arthritis.  An
MRI[4] taken at that time
showed protruding disks at L4-L5 and L5-S1.  His medical records also indicate
that Belford had “postural changes and pelvic distortion.”  

            In 1997, Belford sought treatment for
pain in his neck and radiculopathy[5]
causing pain in his left shoulder and numbness in his left arm.  His treating
physician opined that the disks between his fourth through seventh cervical
vertebrae were compressed, and he diagnosed Belford with “cervical pain
syndrome.”  In another episode that year, Belford reported to his physician
that he had neck pain for the preceding three weeks.

            In 1998, Belford was diagnosed with
degenerative disk disease, arthritis, and chronic bursitis.  In one visit to his
doctor that year, he reported that he had pain in his lower back for the
preceding three weeks that “would not go away.”  An MRI performed in 1998 also revealed
“mild scoliosis and exaggerated lordosis.”  Scoliosis is a “lateral
curvature of the spine,” and lordosis is an “abnormally exaggerated
forward curvature of the spine.”  Webster’s
Third New International Dictionary 2035, 1337
(Philip Babcock Gove ed., 3d ed. 1993).  

            In 1999 and 2000, Belford had
chiropractic adjustments to his neck as well as his back, but he continued to
have episodes of lower back pain that lasted for weeks and were not helped by
chiropractic adjustment.  An MRI in 1999 showed that the L5-S1 space had
continued to narrow and Belford was developing bone spurs on his vertebrae. 
His back pain continued to be located primarily at L5-S1.  Around this time, Belford
had surgery on his left shoulder to repair a torn rotator cuff.  In 2001, he
also saw a physician for pain in the right side of his neck.

            Belford and his physician first discussed
spinal surgery in 2002.  His doctor directed him to have another MRI on his
lumbar spine, but Belford did not do so.  When he saw his primary-care
physician again for pain at L5-S1 in 2003, the physician referred him to
another doctor “for disk disease.”  An MRI performed that year was essentially
unchanged from his 1999 MRI.   

B.        Post-Accident Medical Evidence

            The day of
the accident, paramedics transported Belford from the scene to West Houston
Medical Center, where he complained of pain in his lower back and left arm. 
The next day, Belford saw his primary-care physician for pain in his left arm
and tenderness over his sternum.  The doctor noted a bruise on Belford’s left
arm and diagnosed “musculoskeletal strain.”  

            Although he
was happy with his regular chiropractor, Belford began seeing a different
chiropractor, Dr. Gabriela Smart, at his lawyer’s recommendation.  When he saw
her four days after the accident, he reported pain in his upper, middle, and
lower back, his neck, and his tailbone, as well as numbness and tingling in his
left arm and both legs.  He additionally stated that he had difficulties with
his activities of daily living.  He did not report his history of neck or back
pain.  An MRI performed three weeks after the accident revealed degenerative
disk disease, herniated disks[6]
at C3-C4, C5-C6, C6-C7, L4-L5, and L5-S1, but “no evidence of any direct spinal
cord or nerve root compression.”  

            In December
2005, Belford was referred to orthopaedic surgeon Zoran Cupic.  According to
Dr. Cupic, Belford stated that “he did have problems with his low back when he
was 20 years old.  This has gotten better and he has had a regular job since
then.  He has never had another injury or any other problem with his low back.” 
Dr. Cupic diagnosed Belford with degenerative disk disease at C3-C4, C5-C6,
C6-C7, and “the lumbosacral spine, primarily at L5-S1.”  He additionally
diagnosed severe back and neck strain.  Neurologist Charles Popenoy also saw
Belford that month.  Dr. Popenoy found spinal stenosis from C3 to C7 from
herniated disks and bone spurs, as well as large herniated disks at L4-L5 and
L5-S1.  In January 2006, Belford consulted with orthopaedic surgeon Kenneth
J.H. Lee, and his diagnosis was essentially the same as the one Belford
received from Dr. Popenoy.  

            In October 2006, Dr. Stephen Esses removed
the herniated disk at L5-S1.  The surgery resolved Belford’s back and leg
symptoms, and Dr. Esses noted that the wound healed completely.  He attributed
Belford’s pain to the accident because Belford told the doctor that his pain
became worse after the collision.  Dr. Esses further reasoned that because the
vast majority of patients with degenerative disk disease do not require
surgery, and Belford did require surgery, the accident was the probable cause. 
On the other hand, Dr. Esses agreed that the disk herniation could have
occurred before the auto accident, and testified that a herniated disk usually
is not caused by a single event.  The doctor also agreed that when Belford began
seeing him three-and-a-half months after the accident, Belford did not inform him
of two prior injuries to his back.  In the first incident, which occurred in
1993 or early 1994, Belford was assaulted from behind and knocked unconscious,
which caused him to fall on his face.  That incident caused puffiness in his
face, lumbar strain, cervical strain, pain in his shoulder, pain in the back of
his head, and left a half-inch scar over one eye.  The second incident occurred
at work when Belford was climbing out of an aerial platform.  Dr. Esses
characterized Belford’s prior back and neck problems as “significant.”

            In the months after the lumbar
diskectomy, Belford’s back pain resolved but he began to complain of increasing
pain in his neck and radiating down his arms, particularly his right arm.  A
cervical MRI showed that the herniated disk at C3-C4 now caused the bones to be
out of alignment and to compress the spinal cord.  On November 28, 2007, Dr.
Esses operated on Belford’s neck to remove the herniated disk, realign the two
vertebrae, and attach a plate to hold them stable.  The surgery also was
intended to correct Belford’s radiculopathy.  In concluding that the accident
necessitated the surgery, Dr. Esses relied on Belford’s representations that
the symptoms from his left arm increased after the collision.  He agreed,
however, that the disk herniations probably were not the result of the
accident, but instead occurred over a long period of time.  He also explained
that the malalignment, or retrolisthesis, was caused by the disk herniations,
and not by the accident.  In addition, he noted that he removed a bone spur at
this level, but explained that the accident did not cause the bone spurs, which
instead form over a long period of time. 

            By January 2008, Belford informed Dr.
Esses that the surgery to his neck had resolved the symptoms in his arm.  On
January 24, 2008, Belford told Dr. Esses that he was about eighty percent
better.  Six days later, he saw his primary-care physician, who noted the
surgery to Belford’s neck with the words “initial success.”  As to Belford’s
lumbar symptoms, however, Belford now reported that he was in chronic pain and
could not sit or walk for long.  His primary-care physician referred him to
neurologist Hazem Machkhas and prescribed Neurontin.[7]  Dr. Machkhas did
not testify, but his records were admitted into evidence.  Dr. Machkhas wrote
that Belford complained of “what appears to be muscle pain in the low back as
well as the neck.”  He noted some lumbar muscle spasms but “no weakness or
sensory loss,” and he recommended that Belford perform lumbar and cervical
exercises and “start minimizing his Vicodin intake.”[8]  

            Belford saw his primary-care physician in
March 2008 for complaints of neck pain, and reported that he was feeling better
while taking Neurontin.  A cervical MRI performed around this time showed that
the cervical fusion was healed, although bone spurs remained on other vertebrae
below the fusion.  Belford was again referred to a neurologist, and on April
15, 2008, Dr. Machkhas noted that Belford’s back was improved, but he continued
to complain of severe neck pain, which Dr. Machkhas described as “most likely
musculoskeletal.”  Dr. Machkhas increased Belford’s dosage of Neurontin and
recommended exercise.  A week later, Belford called Dr. Machkhas’s office and
demanded to be seen within the next two days because “he has to be seen before
his lawyer files the suit on his behalf.”  As Dr. Machkhas noted, “I told him I
would be happy to refer him to [an]other neurologist who might assist him in
litigation.  He became belligerent, became verbally abusive, and proceeded to
hang up.”  Dr. Machkhas played no further role in Belford’s treatment.

            Dr. Esses examined Belford on March 6 and
March 24, 2008, and noted that Belford had no further arm symptoms, but still
had neck pain.  He referred Belford to a neurologist in March 2008, and although
there are records of Dr. Machkhas’s examination of Belford on April 15, 2008,
Dr. Esses testified that Belford still had not seen a neurologist by the time
he saw Dr. Esses again in early May 2008.  At that time, Belford still had no
further problems with his arms, but he did have a popping sensation in his neck
and some pain.  Dr. Esses referred Belford to neurologist Mohammad Athari, who
began treating Belford in May 2008.  

When Dr. Esses was deposed
in July 2008, he agreed that Belford’s arm pain, tingling, numbness, and
weakness had been resolved, and Belford’s only remaining symptom was neck
pain.  He testified that pain is subjective, and Belford would continue to
experience neck pain from the accident “indefinitely” because “[t]he longer
that you experience pain, continuously, the more likely that that pain is going
to continue.”  He stated that Belford probably would need to take three of the
drugs Dr. Athari prescribed—Soma, a muscle relaxant; Talwin, a narcotic pain
reliever; and Lyrica, a drug to decrease nerve irritability—for the rest of his
life.  Dr. Esses agreed that narcotic pain relievers generally are prescribed
to be taken “as needed,” but stated,  

Most patients who have chronic pain don’t wait until they
have pain to take the medication.  So, I have patients that wake up in the
morning, they don’t have pain when they wake up, but they take a Vicodin or
they take a Vicoprofen because they will [sic] if they do not, they’ll have
pain at noontime or pain at 2:00 o’clock in the afternoon.  

Dr. Esses opined that, “[w]ith the understanding that
impairment is an arbitrary assignment,” Belford would have a “25 percent whole
person impairment based upon the fact he had a cervical radiculopathy, which
awards him a 15 percent impairment, and a lumbar radiculopathy, which will
award him a 10 percent impairment.” 

C.        The
Belfords’ Testimony Concerning Pain, Mental Anguish, and Impairment

            Belford offered conflicting testimony
about his back and neck pain.  In a pretrial deposition, Belford agreed that
prior to the accident, he had back pain “just about every day,” with “some days
worse than others.”  At trial, he was asked about this testimony, and he
stated, “I guess it was the wrong answer . . . .”  He agreed that he had as
many problems with his neck before the accident as after the accident, but he
also testified that he “really didn’t have that many problems” with his neck
before the collision.  When asked if his neck pain after the accident was
different from his pain before the accident, he stated, “It was somewhat like
the past” but it “wouldn’t go away.”  He stated that he did not recall any
problems with his arm before the accident, but he now has numbness and burning
in his right arm, fingers, and hand.  He testified that without the medication
Dr. Athari prescribed, the pain would be unbearable.

            Belford did agree, however, that he had
to give up some activities before the accident due to problems with his back. 
He explained that even before 2005, he sometimes would move the wrong way and
his back would “go out” to the extent that he could not walk.  Although he
played basketball for exercise every week for many years, he gave it up in 2001
because it caused problems with his back.  He also testified that before the
accident, “I was mowing the yard and my back went out on me one time, and I don’t
mow it no more.”  

            When asked
to identify activities he can no longer perform as a result of the accident, he
stated that he can no longer clean the pool and cannot play with his children
as he would like because he cannot feel his hands at times.  As a result, he drops
things.  Because he was afraid that he would drop his 20-pound infant son, he
put the child in day care while his wife works instead of caring for the baby
himself.  

            Belford
still exercises, however, and testified that it “helps a lot.”  At the time of
trial, he had a regular exercise routine using a rowing machine and various
weight machines for a total of an hour to an hour-and-a-half each day. 
Depending on the type of weight machine used, he could lift 50 to 110 pounds. 
He goes to the same nightclub every Friday night and dances “sometimes, but not
often.”  At a pretrial deposition, he stated that he dances fast, but at trial
he denied this.  

            Belford’s
wife Kenecia’s testimony was similar.  She testified that she had known her
husband since 1997, although they were divorced for part of that time.  She
stated that before the accident, Belford went to the chiropractor two or three
times a year for back pain and never had neck pain.  According to Kenecia,
Belford was more cautious in handling their youngest child than he had been in
handling their other children before the accident.  She stated that he even
stood differently, and turned his head by moving his whole body.  She related
that their daughter told Belford she would teach her brother to play
basketball, but Belford said he would do that.  Kenecia stated that “he kind of
got bothered by that” because “it just reminded him that, you know, maybe he
will, maybe he won’t.  He may not be able to.”  She also testified that one of
her husband’s medications made him groggy so that he slept during the day, and
another medication made him restless at night, but without them, he suffered
unbearable pain.

VI.  Analysis

            Having
summarized the relevant evidence, we now consider its factual sufficiency to
support the jury’s zero-damage findings in the challenged categories.  To the
extent possible, we first consider the evidence unique to each category, and
then consider the evidence that overlaps these damage categories.  In doing so,
we remain mindful that “[m]atters of past and future pain and suffering,
disfigurement and physical impairment are necessarily speculative, and it is
particularly within the province of the jury to resolve these matters and
determine the amounts attributable thereto.”  Nowsco Servs. Div. of Big
Three Indus., Inc. v. Lassman, 686 S.W.2d 197, 200 (Tex.
App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.) (citing Rosenblum v.
Bloom, 492 S.W.2d 321, 325 (Tex. Civ. App.—Waco 1973, writ ref’d. n.r.e.)). 
The trier of fact is the sole judge of the credibility of the witnesses and the
weight to be given to their testimony.  Teel v. Shifflett, 309 S.W.3d
597, 603 (Tex. App.—Houston [14th Dist.] pet. denied).  We may not substitute
our own judgment for that of the jury, even if the evidence would clearly
support a different result.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998).  Consequently, the amount of evidence necessary to
affirm a judgment is far less than that necessary to reverse a judgment.  GTE
Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599, 616 (Tex. App.—Houston
[14th Dist.] 2001, pet. denied).

A.        Disfigurement

            “Disfigurement
has been defined as that which impairs or injures the beauty, symmetry, or
appearance of a person or thing; that which renders unsightly, misshapen or
imperfect, or deforms in some manner.”  Goldman v. Torres, 161 Tex. 437,
447, 341 S.W.2d 154, 160 (1960) (citing Superior Mining Co. v. Indus.
Comm’n, 309 Ill. 339, 340, 141 N.E. 165 (1923)).  Although “disfigurement”
was not defined in the jury charge, we have previously noted that the word’s
common meaning is the same.  See Kroger Co. v. Brown, 267 S.W.3d 320,
323 (Tex. App.—Houston [14th Dist.] 2008, no pet.).  

            In
challenging the jury’s zero-damage findings for future as well as past disfigurement,
Belford makes the same argument.  He asserts that “the opening of [his] back
and neck to perform the surgery left scarring and imperfections where formerly
there was none.”  He then argues that the appellate courts have upheld disfigurement
damages based on evidence of scarring.  See, e.g., Hopkins County
Hosp. Dist., 344 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ) (upholding
finding of $50,000 for future disfigurement where plaintiff was left with a
long vertical scar on her abdomen and produced evidence that she was
embarrassed by it and that “some people who see her scar have said and will say
‘yuck’ because it looks bad”); Nw. Mall, Inc. v. Lubri-lon Int’l, Inc.,
681 S.W.2d 797, 804 (Tex. App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.) (upholding
finding of $25,000 for past disfigurement and $30,000 for future disfigurement
where plaintiff required six surgeries with progressively bigger scars, and plaintiff
considered herself deformed and would only wear clothes that covered the
scars); Pedernales Elec. Coop., Inc. v. Schulz, 583 S.W.2d 882, 886 (Tex.
Civ. App.—Waco 1979, writ ref’d n.r.e.) (upholding $4,000 disfigurement award that
was supported by “actual showing of the scar to the jury,” photographs in the
record, and medical testimony that the scar would “remain about the same permanently”). 
Here, however, there was evidence that surgical incisions were made, but there
is no evidence in the record that Belford has been or will be left with
perceptible scars or imperfections.  None were mentioned by the witnesses, and
none are described in the medical records.  

            Belford’s position
seems to be that surgery necessarily leaves scars, and scars are necessarily
disfiguring, so that conclusive proof of surgery is conclusive proof of
disfigurement.  We disagree.  As we have previously observed, the jury has
“considerable discretion” in determining whether a person has been disfigured,
and determining the appropriate compensation.  See Tri-State Motor Transit
Co. v. Nicar, 765 S.W.2d 786, 494 (Tex. App.—Houston [14th Dist.] 1989, no
writ).  In reviewing such findings, we must consider each case on its own
facts.  Id.  During his testimony, Belford did not show any surgical
scars to the jury nor did he testify that he felt disfigured or deformed.  There
is no evidence in the record depicting or describing any surgical scars, and no
witness testified on the subject.

            On this
record, we conclude that the jury’s finding of zero damages for past and future
disfigurement is not against the great weight of the evidence.  

B.        Future
Physical Impairment

            “‘Physical
impairment’ encompasses loss of the injured party’s former lifestyle, the
effect of which must be substantial and extend beyond any pain, suffering,
mental anguish, lost wages, or diminished earning capacity.”  Kroger Co.,
267 S.W.3d at 324.  “Indeed, if other elements such as pain, suffering, mental
anguish, and disfigurement are submitted, there is little left for which to
compensate under the category of physical impairment other than loss of
enjoyment of life.  Golden Eagle Archery, 116 S.W.3d at 772.

            Belford
argues that the jury’s finding of zero damages for future physical impairment
is against the great weight of the evidence because Dr. Esses (1) testified
that Belford is “not going to be engaged in doing heavy lifting, bending, or
twisting”; (2) “would not recommend” that Belford resume playing
basketball; and (3) opined that he has a 25% permanent impairment based on his
cervical and lumbar radiculopathy.  As to his first contention, the jury may
not have credited Dr. Esses’s testimony that Belford was unable to bend, twist,
or perform heavy lifting.  This testimony arguably was contradicted by Belford’s
testimony that he works out at a gym for sixty to ninety minutes every day
using a rowing machine and lifting weights of 50 to 110 pounds using a dozen
different kinds of machines “that work every part of your body.”  See Peter
v. Ogden Ground Servs. Inc., 915 S.W.2d 648, 650 (Tex. App.—Houston [14th
Dist.] 1996, no pet.) (upholding award of zero damages for future physical
impairment where plaintiff’s injuries would require him to avoid lifting
weights over 45 pounds or repetitively bending and stooping).  

            The jury
also may have concluded that, after two surgeries, Belford’s physical
restrictions were no longer any greater than they were before the accident. 
For example, Belford may be unable to play basketball in the future, but he did
not play basketball before the accident, either; his preexisting back problems
caused him to give it up four years before the accident.  The evidence as to
whether Belford “fast dances” is conflicting, but there is no evidence that his
dancing habits before and after the accident are different.  The jury also may
have concluded that any future physical impairment is the result of a
preexisting condition.  

            Finally, the
jury was not required to credit Dr. Esses’s testimony that Belford has a 25%
impairment as a result of the accident.  Not only did Dr. Esses state that the
figure was arbitrary, he explained that he arrived at that percentage by adding
the impairment ratings for cervical and lumbar radiculopathy.  Dr. Esses
further testified that lumbar surgery resolved Belford’s problems with his
legs, and he noted in January, March, and July of 2008 that the cervical
surgery resolved the symptoms in Belford’s arms.  The jury therefore could
conclude that there was no continuing radiculopathy as a result of the
accident.  Although Belford continues to complain of numbness in his right
hand, Dr. Esses repeatedly remarked that the symptoms in Belford’s arms were
resolved, and we are required to accept the jury’s resolution of any conflict
in the evidence.  See Golden Eagle Archery, 116 S.W.3d at 761.  The jury
may have resolved this conflict by crediting Dr. Esses’ testimony rather than
Belford’s testimony.  It also is possible that the jury credited Belford’s
complaints of numbness, but concluded that he did not carry the burden to
establish that these symptoms were the result of the accident. 

            The
availability of such alternatives illustrates why “[t]he determination that the
appellant has not and will not suffer physical impairment apart from that
already compensated for is uniquely within the jury’s province.”  See Landacre
v. Armstrong Bldg. Maint. Co., 725 S.W.2d 323, 325 (Tex. App.—Corpus
Christi 1986, writ ref’d n.r.e.).  On this record we cannot conclude that the
jury’s finding of zero damages for future physical impairment as a result of
the accident is against the great weight of the evidence.

C.        Future
Physical Pain and Mental Anguish

            Pain is a
state of discomfort, distress, or hurt.  See Webster’s Third New International Dictionary 1621.  Mental
anguish is a high degree of mental pain and distress that is more than mere
worry, anxiety, vexation, embarrassment, or anger.  See Parkway Co. v.
Woodruff, 901 S.W.2d 434, 444 (Tex. 1995).  To recover damages for future
mental anguish, the plaintiff must establish that there is a reasonable
probability that he will suffer compensable mental anguish in the future.  See
Adams v. YMCA of San Antonio, 265 S.W.3d 915, 917 (Tex. 2008) (per curiam). 


            Belford contends
that his future medical expenses are for pain medication, and thus, the jury’s finding
of zero damages for future physical pain and mental anguish conflicts with its
finding that he is entitled to $45,000 for future medical expenses.  This argument,
however, has been waived.  A complaint that the jury’s answers conflict must be
raised before the trial court discharges the jury.  Cressman Tubular Prods.
Corp. v. Kurt Wiseman Oil & Gas, Ltd., 322 S.W.3d 453, 462 (Tex.
App.—Houston [14th Dist.] 2010, pet. filed); Tex.
R. Civ. P. 295.  Because Belford did not do so, we need not attempt to
reconcile the purportedly inconsistent findings.  See id. (citing Springs
Window Fashions Div., Inc. v. Blind Maker, Inc., 184 S.W.3d 840, 867 (Tex.
App.—Austin 2006, pet. granted, judgm’t vacated w.r.m.)).  

            Belford
additionally argues that “[o]nce it has been proven by objective evidence that
the injury will continue to affect the Appellant, the jury may not give a take
nothing verdict for future pain, suffering, and mental anguish.”  See Hicks
v. Ricardo, 834 S.W.2d 587, 592 (Tex. App.—Houston [1st Dist.] 1992, no
writ).  The Texas Supreme Court similarly noted in dicta that the jury’s
prerogative to resolve conflicts in evidence “does not mean . . . that a
verdict awarding no damages for pain and suffering should be upheld on appeal
if there is objective, undisputed evidence of a significant injury and the jury
could not have compensated the injured party in some other category of
damages.”  Golden Eagle Archery, 116 S.W.3d at 774–75.  In the quoted statements,
causation is assumed.  These arguments do not apply here, because the evidence
that the accident caused Belford’s pain is primarily subjective, whereas there
is objective as well as subjective evidence that Belford’s spinal injuries,
which are the alleged source of his pain, occurred before the accident.

            The
subjective evidence that Belford’s pain was due to preexisting conditions
include his 27-year history of low-back pain and prior reports of neck pain and
radiculopathy.  Objectively, multiple lumbar MRIs taken before the accident show
significant spinal problems including scoliosis, lordosis, arthritis,
degenerative disk disease, dessicated disks, protruding disks, narrowing of the
space between vertebrae, and bone spurs.  Although there are no pre-accident
cervical MRIs in the record, an MRI taken three weeks after the accident shows
bone spurs on the cervical vertebrae and multiple herniated disks.  Dr. Esses
testified that it is not known when Belford’s disk herniations occurred, but
herniation usually is not caused by a single event, and in all probability, these
occurred over a long period of time.  He similarly testified that bone spurs
occur over an extended time period, and he did not attribute them to the
accident.  Based on this evidence, the jury could conclude that Belford’s
injuries were attributable to his preexisting conditions.

            The
conflicting evidence for an award of damages for future physical pain and mental
anguish is based on Belford’s subjective testimony or the statements of his
wife and doctors—which, in turn, are based on Belford’s subjective reports of
pain.  The jury was free to disbelieve all or any part of Belford’s reports of
the nature and severity of his pain, and to similarly reject the testimony of
other witnesses founded on those subjective complaints.  See Cox. v.
Centerpoint Energy, Inc., No. 14-05-01130-CV, 2007 WL 1437519, at *6 (Tex.
App.—Houston [14th Dist.] May 17, 2007, no pet.) (mem. op.).  

            Finally, Dr.
Esses testified that many patients who have conditions that can cause chronic
pain take their medication on a schedule to prevent pain, rather than taking it
as needed to relieve pain.  Based on this testimony, the jury may have concluded
that Belford’s medication would prevent pain from arising.  

            On this
record, we cannot say that the jury’s finding of zero damages for future
physical pain and mental anguish is against the great weight of the evidence. 
Because the evidence is factually sufficient to support the challenged
findings, the trial court did not err in denying Belford’s motion for new
trial.  We therefore overrule both of the issues presented in this appeal.

VII.  Conclusion

            For the
foregoing reasons, we affirm the trial court’s judgment.

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

 

Panel consists of Justices Seymore, Boyce, and Christopher
(Seymore, J., concurs without opinion).









[1] This accounts for 16 of
the 17 providers.  The jury found that Belford was entitled to an award for the
remaining health-care provider’s services, but we have found no evidence in the
record as to the amount charged by that entity, and therefore cannot say
whether that amount was equal to the amount charged.





[2] Capitalization and
punctuation standardized.





[3] Because one of the clinics
where he was treated had closed, and because he could not remember the name of
one of his previous chiropractors, Belford was not able to produce all of the
medical records related to the care he received for his back or neck pain prior
to the accident.  





[4] The jury heard from Dr.
Stephen Esses that this stands for “magnetic resonance imaging.”





[5] As Dr. Esses explained at
trial, “radiculopathy means involvement of the nerve that goes from the spine
down the extremity.”





[6] Dr. Esses explained that
a herniation is “disk material that [is] outside its usual confines.”  





[7] At trial, Dr. Esses
testified that the more expensive drug Lyrica, which is prescribed to decrease
nerve irritability and treat neuropathy, is similar to Neurontin.





[8] Dr. Esses stated that
Vicodin is a narcotic pain reliever.